IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**THOMAS MICHAEL RILEY,**
*Appellant,*

No. CR-15-0411-AP
Filed March 10, 2020

Appeal from the Superior Court in Maricopa County
The Honorable Peter C. Reinstein, Judge
No. CR2011-008004-002
CR2013-002559-002
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, O.H. Skinner, Solicitor General, Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section, Tucson, Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender, Mikel Steinfeld (argued), Deputy Public Defender, Phoenix; Attorneys for Thomas Michael Riley

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, AND JUSTICES BOLICK, GOULD, BEENE, and PELANDER (RETIRED)* joined.

JUSTICE LOPEZ, opinion of the Court:

¶1     This automatic appeal arises from Thomas Michael Riley's convictions and death sentence for the murder of Sean Kelly. We have

---

* Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable John Pelander, Justice of the Arizona Supreme Court (Retired), was designated to sit in this matter.

jurisdiction under article 6, section 5(3) of the Arizona Constitution and
A.R.S. §§ 13-4031, -4033(A)(1).

## BACKGROUND

¶2        In June 2008, Riley and Kelly were inmates at the Arizona
State Prison Complex-Lewis in Buckeye.  With the intent of gaining full
membership into the Aryan Brotherhood ("AB"), a violent prison gang
composed of white inmates, Riley requested and received authorization
from the AB to assault Kelly.  On June 29, after divulging his plan to three
other AB prospective members ("probates"), all of whom refused to assist
and tried to talk him out of the murder, Riley and two accomplices sneaked
into Kelly's cell and stabbed him with homemade prison knives 114 times.[1]
Riley then changed into Kelly's clothing from his cell, washed up, and
returned to his cell.  Kelly was dead by the time correctional officers and
medical staff responded to his cell.

¶3        In the subsequent investigation, correctional officers found
blood on Riley's elbows and forearm.  Inside Kelly's cell, investigators
found a bloody pair of pants with Riley's inmate card inside its pocket and
a bloody shirt imprinted with Riley's inmate number.  Inside Riley's cell,
investigators found a pair of socks and a t-shirt with Riley's inmate number,
both of which had blood on them. Subsequent DNA testing confirmed that
the blood on Riley, as well as the blood on the socks and t-shirt in his cell,
matched Kelly's DNA profile.

¶4        An investigator discovered that Riley had sent a change-of-
address form to a book publisher listing his new address as a maximum-
security facility.  The investigator surmised that Riley mailed the form
before Kelly's murder because he had been in lockdown since the incident.
At the time, Riley had not been scheduled for relocation.

¶5        Nearly two years after Kelly's murder, another inmate gave
investigators a letter he had received from Riley, explicitly describing the
murder.  Handwriting analysis, as well as the identification of Riley's
fingerprint on the letter, confirmed that he wrote it.  In the letter, Riley

---

[1] Investigators suspected that one of Riley's accomplices was Eric Olsen, an
inmate living in C Pod in a cell immediately above Kelly's, who was
affiliated with the AB.

claimed he had stabbed Kelly fifty times and his accomplices had stabbed Kelly twenty times each. He also listed three "defining moments" from the murder: (1) passing a frightened, young inmate on his way into Kelly's housing area; (2) the look on the face of an inmate who had stumbled onto the scene while Riley was washing up; and (3) the sound of Kelly's last breath leaving his limp body. Riley drew a large smiley face after that final sentence and signed the letter "Your hero the butcher" in both German and English.

¶6        A jury found Riley guilty of first degree murder and assisting a criminal street gang. The jury also found five aggravating circumstances: Riley was previously convicted of a serious offense; he committed the murder in an especially heinous, cruel, or depraved manner; he committed the murder while in the custody of the Arizona Department of Corrections ("ADOC"); he committed the murder to promote, further or assist a criminal street gang; and he committed the murder in a cold and calculated manner without pretense of moral or legal justification. A.R.S. §§ 13-751(F)(2), (F)(6), (F)(7)(a), (F)(11), and (F)(13) (2012). Considering these factors and the mitigation evidence, the jury found death was the appropriate sentence for Kelly's murder. The trial court also sentenced Riley to 11.25 years' imprisonment, consecutive to the death sentence, for the criminal street gang offense.

## DISCUSSION

### A.        Denial of Motion to Change Counsel

¶7        Riley argues the trial court erroneously denied his motion to change counsel. We review the court's denial of a request for new counsel for abuse of discretion. *State v. Hernandez*, 232 Ariz. 313, 318 ¶ 11 (2013). An abuse of discretion occurs when "the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice." *State v. Chapple*, 135 Ariz. 281, 297 n.18 (1983), *superseded by statute on other grounds*.

¶8        On August 25, 2013, nearly two years after the initial indictment and two years before trial, Riley filed a motion to change his lead counsel, Randall Craig, on a pre-prepared form that provided no factual basis for the request. Craig responded by informing the court in writing "that communication between Defendant and Counsel now ceases

to exist. Defendant is no longer accepting Counsel's advice." Craig also stated, "A mutual distrust exists between Defendant and Counsel. Counsel has tried to repair the damaged relationship but has been unable to do so." Ultimately, he urged the court to grant the motion to ensure Riley "receive[d] adequate assistance of counsel."

¶9 On September 11, the trial court held a hearing to address Riley's motion. After noting the lack of grounds supporting the motion, the court asked Riley if he had anything to add. Riley made general statements regarding the lack of communication, cooperation, and trust between him and Craig, dating back six to eight months. The court informed Riley he was entitled to competent counsel, not "a great relationship," and observed that both of Riley's attorneys were competent. Riley complained Craig was frequently unreachable and had only spent four hours at the prison discussing Riley's case with him in the preceding year-and-a-half. Riley stated that his relationship with Craig had "clearly deteriorated to where there is no trust at all."

¶10 When questioned by the court, Craig stated, "[W]ith all candor to the court, I must say we aren't communicating. I have to be honest with that fact. We are not. He doesn't seem to like me." After the court noted that Riley did not have to like his attorneys, Craig stated, "I understand. And that's all that I am going to say at this point." The court then informed Riley that it was not inclined to grant the motion "without more." Riley added that Craig had failed to show up to four or five scheduled meetings at the prison, had failed to conduct witness interviews, and had failed to appear at an appointment to view the crime scene. In response to the trial court's observation that Craig appeared to be preparing his defense, as evidenced by his hiring mitigation specialists and an investigator, Riley conceded that "[t]he mitigation aspect is ahead of schedule. I will give him credit." After Riley finished his argument and after a brief recess, the trial court denied Riley's motion to change lead counsel.

¶11 Craig continued as Riley's counsel after the trial court denied the motion to change counsel. Craig served as Riley's advisory counsel during his brief period of self-representation (April 1, 2015–October 5, 2015) and then resumed his role as lead counsel during the trial. Riley did not renew his motion to change counsel.

4

**¶12**      The Federal and Arizona Constitutions guarantee criminal defendants the right to representation by competent counsel. *State v. Goudeau*, 239 Ariz. 421, 447 ¶ 77 (2016) (citing U.S. Const. amend. VI; Ariz. Const. art. 2, § 24; A.R.S. § 13-114(2); *State v. LaGrand*, 152 Ariz. 483, 486 (1987)). An indigent defendant, however, is not "entitled to counsel of choice, or to a meaningful relationship with his or her attorney." *State v. Torres*, 208 Ariz. 340, 342 ¶ 6 (2004) (quoting *State v. Moody* ("*Moody I*"), 192 Ariz. 505, 507 ¶ 11 (1998)). "But when there is a complete breakdown in communication or an irreconcilable conflict between a defendant and his appointed counsel, that defendant's Sixth Amendment right to counsel has been violated" and a resulting conviction must be reversed. *Id.*; *accord Moody I*, 192 Ariz. at 509 ¶ 23.

**¶13**      To preserve a defendant's Sixth Amendment right to counsel, the trial court has a "duty to inquire as to the basis of a defendant's request for substitution of counsel." *Torres*, 208 Ariz. at 343 ¶ 7. During this inquiry, the defendant bears the burden of proving either a "complete breakdown in communication or an irreconcilable conflict." *Id.* at 342 ¶ 6. "To satisfy this burden, the defendant must present evidence of a 'severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible.'" *Hernandez*, 232 Ariz. at 318 ¶ 15 (quoting *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002)). A defendant must show more than "personality conflicts or disagreements with counsel over trial strategy." *State v. Cromwell*, 211 Ariz. 181, 187 ¶ 30 (2005). A defendant's claims against his attorney of ineffective trial preparation and failure to communicate, when unsupported by the record, are generally characterized as disagreements over trial strategy. *See Hernandez*, 232 Ariz. at 321 ¶ 33.

**¶14**      In response to Riley's complaints, Craig acknowledged that "communication between Defendant and counsel now ceases to exist," which is precisely the situation that, if true, would entitle Riley to substitution of counsel. Craig added that mutual distrust existed with his client, that efforts to repair the relationship were unsuccessful, and that the motion should be granted to ensure Riley received adequate counsel. But the "mere possibility that the defendant had a fractured relationship with counsel does not amount to structural error." *Torres*, 208 Ariz. at 344 ¶ 12. The trial court was entitled to delve into the substance behind the assertions and, in doing so, it found the basis for substitution wanting.

¶15 At the hearing, Riley alleged that Craig failed to conduct any interviews and failed to appear for an appointment to view the crime scene. We have repeatedly rejected these types of complaints as disagreements over trial strategy, which do not amount to irreconcilable differences. *See Goudeau*, 239 Ariz. at 447 ¶ 76, 448 ¶ 84; *State v. Henry*, 189 Ariz. 542, 547 (1997). Riley's primary complaint against Craig at the hearing, however, was lack of communication. Riley alleged Craig had only met with him for a total of four hours in the preceding year and a half and had missed several appointments to meet with him in prison. Craig agreed in his response to Riley's motion and at the hearing that his communications with Riley had ceased to exist.

¶16 We have historically required "intense acrimony and depth of conflict" before finding a complete breakdown in communication and requiring new counsel. *See Cromwell*, 211 Ariz. at 188 ¶ 37; *see also Hernandez*, 232 Ariz. at 318 ¶ 16, 321 ¶ 36 (finding no abuse of discretion even though defendant alleged only four visits with counsel over the course of two years). Riley attempts to compare his minimal interactions with his attorney to those between the defendant and his attorney in *Moody I*. But the *Moody I* record was "replete with examples of a deep and irreconcilable conflict" between the defendant and his attorney. 192 Ariz. at 507 ¶ 13. Moody accused his lawyer and the lead public defender of being "incompetent and crazy." *Id.* at 508 ¶ 16. He developed an "obsessive hatred" for his attorney and the public defender's office and, on at least one occasion, he and his attorney were "almost at blows" with one another. *Id.* Moody believed his lawyers were conspiring with the prosecutor, the court, and the doctor tasked with evaluating his competency to have him declared insane. *Id.* He also threatened to file ethical complaints against his lawyer and the public defender's office. *Id.* ¶ 18. None of these examples of "intense acrimony and depth of conflict" is present here. *See also Torres*, 208 Ariz. at 343 ¶ 9 ("[Defendant] presented specific factual allegations that raised a colorable claim that he had an irreconcilable conflict with his appointed counsel.").

¶17 On the contrary, despite Riley's and Craig's claim of an irreconcilable conflict or a complete breakdown in communications, the record belies their stark characterization of their relationship. Riley gave Craig's defense team "credit" for their efforts in preparing mitigation. Riley's knowledge of the status of his case further demonstrates that he and

Craig were communicating about his defense. In fact, Riley regularly corresponded with Craig in writing before the change of counsel hearing, albeit primarily to complain about the frequency of Craig's visitation and status reports, but their substantive written correspondence continued after denial of his motion. Thus, because Riley failed to demonstrate an irreconcilable conflict or a completely fractured relationship with Craig, the trial court was not required to appoint new counsel. *See Cromwell*, 211 Ariz. at 186 ¶ 29.

¶18 To the extent Riley faults the trial court for failing to conduct further inquiry into the source of his alleged conflict with Craig, Riley and Craig effectively foreclosed further inquiry. For his part, Riley explained the reasons for his dissatisfaction, which the trial court deemed insufficient to require new counsel. Craig simply noted that "[Riley] doesn't seem to like me" and "that's all I'm going to say at this point." Moreover, neither Riley nor Craig requested or intimated that an ex parte hearing was necessary to determine the source of the alleged conflict. Under these circumstances, the record does not support Riley's assertion of an irreconcilable conflict or complete breakdown in communications.

¶19 If the defendant shows "[c]onflict that is less than irreconcilable," a trial court should consider the conflict as a factor among several other factors in determining whether to appoint new counsel. *Id.* ¶ 29. The other factors—often referred to as the *LaGrand* factors—are: (1) "whether new counsel would be confronted with the same conflict;" (2) "the timing of the motion;" (3) "inconvenience to witnesses;" (4) "the time period already elapsed between the alleged offense and trial;" (5) "the proclivity of the defendant to change counsel;" and (6) the "quality of counsel." *Id.* at 187 ¶ 31 (quoting *LaGrand*, 152 Ariz. at 486–87).

¶20 These factors tend to favor substitution here, save the last, given that no dispute exists that Riley's counsel was competent. But "quality of counsel" was the only one of the six factors that the trial court expressly considered. The State acknowledged that different counsel would probably not have the same conflict. Although the request for substitution occurred well into trial preparation, no trial date was yet scheduled, so the case presumably could have proceeded without significant disruption as Riley showed no prior proclivity toward substituting counsel. *See Moody I*, 192 Ariz. at 509–10 ¶ 21.

**¶21**      Applying the *LaGrand* factors against the backdrop of Craig's avowal of a complete breakdown in communication, there were clear grounds to grant the motion. However, because the trial court conducted a hearing to determine whether there was an actual breakdown in the attorney/client relationship, we review the trial court's decision to deny the request for an abuse of discretion. *Goudeau*, 239 Ariz. at 446 ¶ 68. In denying Riley's motion to change counsel, the trial court did not refer to the *LaGrand* factors and gave no explicit reasons for denying the motion. But this Court may affirm on any basis in the record. *See, e.g., State v. Robinson*, 153 Ariz. 191, 199 (1987).

**¶22**      Based on the hearing, it appears that the core of Riley's claims against Craig regarding the cause of their asserted breakdown in communication was rooted in disagreements over trial strategy. [2] But "[a] single allegation of lost confidence in counsel does not require the appointment of new counsel, and disagreements over defense strategies do not constitute an irreconcilable conflict." *Cromwell*, 211 Ariz. at 186 ¶ 29; *Hernandez*, 232 Ariz. at 321 ¶ 33. Moreover, the trial court witnessed Riley and Craig interact for more than a year which led to the trial court's conclusion that Riley's lead counsel was providing competent representation. Accordingly, the trial court did not abuse its discretion when it denied Riley's motion to change lead counsel, and Riley is not entitled to relief on this issue.

**¶23**      Finally, even if the trial court abused its discretion in denying Riley's change of counsel motion, it is subject to harmless error review because Riley failed to prove an irreconcilable conflict or complete breakdown in communication. *Cf. Torres*, 208 Ariz. at 343–44 ¶¶ 11–13 (holding that structural error applies to only a few enumerated situations and the harmless error standard applies to a trial judge's summary denial of a motion to change counsel); *see also State v. Ring (III)*, 204 Ariz. 534, 552–53 ¶ 46 (2003) ("The Supreme Court has defined relatively few instances in

---

[2] Riley's trial strategy dispute with Craig persisted after the trial court denied his motion for new counsel. On April 1, 2015, when the trial court granted Riley's motion for self-representation, Riley clarified that the basis for his motion was that he and Craig were "at odds with strategy and the direction of the case." But Riley also emphasized the importance of retaining "the same team as [his] legal advisors" because they had been working on the case together for three and a half years.

which we should regard error as structural."). It is difficult to understand how any error caused an unfair trial given that Riley does not contest that his counsel was competent; and indeed, Riley complains here about issues that arose when he self-represented or rejected his attorney's advice. Riley is not foreclosed from raising issues concerning inadequate representation in subsequent proceedings, but we conclude that his Sixth Amendment right to counsel was not violated in light of the evidence before the trial court.

**B.      Description of Aggravating Factors in Juror Questionnaire**

¶24      Riley argues the juror questionnaires erroneously described Arizona's aggravating factors as "very few" and "very specific," which created an illegitimate eligibility factor that the State never proved. Because Riley did not object to the language in the questionnaires at trial, we review for fundamental error. *See State v. Anderson*, 210 Ariz. 327, 341 ¶ 45 (2005). Under fundamental error review, the defendant bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice. *State v. Escalante*, 245 Ariz. 135, 140 ¶ 21 (2018); *State v. Bearup*, 221 Ariz. 163, 168 ¶ 21 (2009); *see also State v. Henderson*, 210 Ariz. 561, 567–68 ¶¶ 19–20 (2005). An error is fundamental when it "goes to the foundation of [the defendant's] case, takes away a right that is essential to [the defendant's] defense, [or] is of such magnitude that [the defendant] could not have received a fair trial." *Henderson*, 210 Ariz. at 568 ¶ 24 (citing *State v. Hunter*, 142 Ariz. 88, 90 (1984)); *see also Escalante*, 245 Ariz. at 140 ¶ 16 (holding that the three prongs for determining when an error is fundamental are disjunctive).

¶25      At the beginning of jury selection, the trial court provided jurors with written questionnaires. Both Riley (then pro per) and the prosecutor reviewed and approved the questionnaire at a status conference prior to trial. In describing the penalty phase of the trial, the questionnaire stated:

> The penalty phase of the trial may contain two parts. The state must first prove beyond a reasonable doubt that one or more aggravating circumstances exist for a defendant to be eligible for a death sentence. Aggravating circumstances are set forth in the law. *The law*

> *allows only a very few and very specific aggravating circumstances to be used, if proven beyond a reasonable doubt, to make a defendant convicted of Murder in the First Degree eligible for a death sentence.*

(emphasis added). The portion emphasized above was also repeated as an introduction to Question 59 of the questionnaire.

¶26 While questioning one of the jurors during voir dire, Riley highlighted the "very few" and "very specific" language, asking the prospective juror whether he or she agreed with the statement made in the preamble to Question 59. After reading the statement twice verbatim, Riley reworded the statement as follows:

> In layman's terms, there is a [sic] very few criteria that qualify a murder from being a murder to being a capital murder warranting the death penalty, and you would have to agree and follow those rules and not allow other subjectivity to come in to make your decision on that.

Riley then asked the prospective juror whether he or she would follow those instructions.

### i. *Legal Accuracy of the Statement*

¶27 Although the court provided further instructions to the jurors regarding the aggravating factors during both the aggravation and penalty phases of the trial, neither the court nor the parties ever used the "very few" or "very specific" language again during the trial.

¶28 Riley argues (1) the statement in the jury questionnaire describing Arizona's aggravating factors as "very few" and "very specific" misstates the law; (2) that misstatement created an unproven, invalid sentencing factor that constituted fundamental error; and (3) he was prejudiced by this error because it led the jury to believe that he was one of only a "very few" individuals eligible for the death penalty.

**¶29** The legal accuracy of the description of Arizona's aggravators as "very few" is debatable. Both Riley and the State recognize that the statement provided a subjective description of the number of statutory aggravating factors in Arizona. But while Riley argues that thirty different aggravating circumstances (ten individual circumstances with a total of twenty sub-parts) cannot reasonably equate to a "very few," the State, ironically, relies solely on the semantic ambiguity of the description to defend the statement's legal accuracy. At most, the description of Arizona's aggravators as "very few" is ambiguous and irrelevant.

**¶30** The description of Arizona's aggravators as "very specific," however, likely misstates the law. To pass constitutional muster, aggravators must "not apply to every defendant convicted of a murder, but only to a subclass, and the aggravating circumstance may not be overly vague." *State v. Hausner*, 230 Ariz. 60, 82 ¶ 99 (2012) (citing *Tuilaepa v. California,* 512 U.S. 967, 972 (1994)). We have repeatedly upheld the constitutionality of Arizona's aggravators, especially those deemed facially vague, based on the "adequate specificity" of narrowing constructions in jury instructions. *See, e.g.*, *Anderson*, 210 Ariz. at 352–53 ¶¶ 109–14 (addressing constitutionality of (F)(6) aggravator). Undoubtedly then, Arizona's aggravators must contain *some* specificity to overcome challenges for vagueness. But there is a substantial semantic difference between "not overly vague" and "very specific." More to the point, there is a noteworthy distinction between "adequately specific" and "very specific."

**¶31** Accordingly, because all or part of the statement likely misstates the law, Riley has fulfilled the first requirement to prove fundamental error. *See supra* ¶ 24

### ii. *Fundamental Nature of the Error*

**¶32** Assuming the statement misstates the law, its single appearance in the jury questionnaire was insufficient to constitute fundamental error. Riley must also prove that the error went to the foundation of his case, took away a right essential to his defense, or was of such magnitude that he could not have received a fair trial. *See Henderson*, 210 Ariz. at 568 ¶ 24 (citing *State v. Hunter*, 142 Ariz. 88, 90 (1984)); *see also Escalante*, 245 Ariz. at 140 ¶ 16 (holding that the three prongs for determining when an error is fundamental are disjunctive).

**¶33** Riley contends the error was fundamental as it prevented him from receiving a fair trial because (1) the statement implied that the court had conducted some narrowing function that identified Riley as "one of only 'a very few' individuals that could actually be put to death" and (2) the subjective nature of the statement left its meaning "open to any interpretation each juror wished to assign." According to Riley, this implication—and the jury's acceptance of it—created an unproven eligibility factor or aggravator.

**¶34** Riley exaggerates the impact of the statement. Immediately before the statement, the questionnaire stated, "The state must first prove beyond a reasonable doubt that one or more aggravating circumstances exist." This informed the jurors of the proper order of proceedings and the State's burden to prove at least one aggravating factor, rendering the subsequent challenged statement irrelevant. Moreover, during voir dire, after the jurors had completed the questionnaire, Riley explained the statement "in layman's terms," emphasizing that jurors had to rely on the aggravating factors, not "other subjectivity," to impose the death penalty. After voir dire, neither the trial court nor the State ever repeated the statement at issue; instead the trial court reiterated the State's burden of proof in both the aggravation and penalty phases of the trial.

**¶35** Contrary to Riley's assertion, the statement did not insert an additional eligibility factor or aggravator. At no point did the trial court or the State assert—or even imply—that Riley's eligibility for the death penalty had been predetermined before trial based on the number or specificity of Arizona's aggravators. In the unlikely event that a juror inferred as much from the jury questionnaire on the first day of trial, the trial court's repeated instructions regarding the State's burden of proof in the subsequent months of trial surely disavowed any such inference by the time the jury found more than a month later that the State had proven all five alleged aggravating circumstances.

**¶36** Accordingly, because the misstatement error did not go to the foundation of Riley's case, did not take away a right that was essential to his defense, and was too insignificant to impact the fairness of his trial, Riley has failed to meet his burden to prove fundamental error and is not entitled to relief on this issue.

### C.    Failure to Question Jurors on Questionnaire Answers Sua Sponte

¶37    Riley argues the trial court erred by failing to question Jurors 1 and 16 sua sponte based upon their answers on the juror questionnaires. Because Riley did not raise a challenge to either of these jurors for cause, we review this claim for fundamental error. *See State v. Bible*, 175 Ariz. 549, 573 (1993).

¶38    On the juror questionnaire, Juror 1 answered "no" to Question 40, which asked whether she agreed that a defendant is not required to present any evidence. In explaining her disagreement on the questionnaire, she asked, "Without being totally familiar with the law—how can a defendant defend themselves without presenting evidence?" In a follow-up question asking whether she could follow this law even if she disagreed with it, Juror 1 answered "yes."

¶39    During voir dire involving Juror 1, the court, the prosecutor, and Riley all explained the State's burden of proving all elements beyond a reasonable doubt and that the defendant had no obligation to testify or present evidence. The prosecutor asked all jurors whether any of them had any questions about the process or any additional information relevant to whether he or she should serve as a juror. No juror replied affirmatively.

¶40    On her questionnaire, Juror 16 answered "yes" to Question 51, which asked whether she believed that a law enforcement officer is always more believable in giving testimony than is a lay person. In answering Question 52, she stated she could follow the court's instruction that a law enforcement officer is not entitled to any greater believability than any other witness by virtue of his or her position as a law enforcement officer. She also disclosed that her father is a retired sheriff's deputy and her sister-in-law is an attorney with the San Francisco District Attorney's Office.

¶41    The prosecutor did not question Juror 16 directly during voir dire. But he questioned two other jurors who also answered affirmatively for Question 51, and he acknowledged there were other jurors who had answered similarly. The prosecutor asked the panel whether they could follow the court's instruction that all witnesses were initially entitled to the same credibility, and all the jurors agreed.

13

¶42 After several jurors mentioned having family members who worked in law enforcement, the prosecutor asked "everyone who has law enforcement in their family or friends" whether there was "[a]nything about those relationships that would affect your ability to be [a] fair and impartial juror?" All prospective jurors except one—who was not impaneled on the jury—shook their heads in the negative. During the voir dire proceedings involving Jurors 1 and 16, Riley failed to question either of them about their answers at issue here, and he did not move to strike either juror.

*i.* *Failure to Question or Strike Jurors*

¶43 Riley argues that the trial court erred by failing to question, sua sponte, Jurors 1 and 16 to determine whether those jurors could render a fair and impartial verdict. By alleging that both jurors had biases that prevented them from rendering such a verdict, Riley necessarily implies that the trial court erred by failing to strike these jurors. *See State v. Velazquez*, 216 Ariz. 300, 306–07 ¶ 18 (2007) ("A defendant is entitled to 'a fair trial by a panel of impartial, indifferent jurors.'" (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992))). Riley's argument is unpersuasive.

¶44 A trial court does not err by failing to question a juror who indicates a disagreement with, or a misunderstanding of, the law if that juror also indicates that he can be fair and impartial, that he will follow the law, and that he has gained understanding of the law he previously misunderstood. *See Bible*, 175 Ariz. at 573. Furthermore, "the trial judge's invitation to counsel to ask follow-up questions mitigates any deficiency in the court's questioning." *State v. Moody* ("*Moody II*"), 208 Ariz. 424, 452 ¶ 98 (2004).

¶45 In *Bible*, one of the seated jurors in a death penalty case indicated on the jury questionnaire that "he would not treat the testimony of police officers as he would other witnesses, did not understand that the State had the burden of proof for each element, and did not agree with the presumption of innocence." 175 Ariz. at 573. Neither the trial court nor the parties conducted follow-up oral inquiry with the juror. *Id.* We held that it was not fundamental error to allow the juror to sit because he subsequently "indicated that he could fairly and impartially listen to and weigh the evidence and render a verdict in accordance with the law," he "understood

that the State had the burden of proof beyond a reasonable doubt," and he "expressed no disagreement with the presumption of innocence, the jury's duty to judge credibility, or the State's burden to prove guilt beyond a reasonable doubt." *Id.* We concluded "follow-up oral inquiry of [the] juror would have been appropriate," but it was "[n]either error [n]or fundamental error for the judge to have failed to sua sponte strike the [juror] for cause." *Id.* at 573–74.

¶46 Here, although Juror 1 initially disagreed that a defendant need not present evidence, she clarified that her disagreement was based on a lack of understanding of the law. Addressing the very next question, the juror indicated affirmatively that she would follow this law even if she did not agree with it. During subsequent voir dire, she gave no indication that she could not or would not hold the State to its burden of proof.

¶47 Juror 16 answered in her questionnaire that a law enforcement officer is more believable than a lay witness. She also indicated that she had family who worked in law enforcement, but unlike the juror in *Bible*, Juror 16 answered affirmatively that she would consider the testimony of law enforcement as she would the testimony of any other witness. Along with other jurors on the panel, she also agreed to follow the court's instructions to gauge the credibility of witnesses equally. When asked whether anything about her relationship with law enforcement would affect her ability to be fair and impartial, she responded "no" with the rest of the panel.

¶48 Furthermore, Riley had full opportunity to question Jurors 1 and 16 regarding their answers on the questionnaire, but he failed to do so. Both jurors gave sufficient indication that they would be fair and impartial, and the trial court did not err by failing to question or strike them from the jury.

¶49 Riley relies on *Morgan v. Illinois*, 504 U.S. 719 (1992) for the proposition that a juror's acknowledgement on a jury form that he could follow the law is insufficient to adequately examine a juror's potential biases. Although the United States Supreme Court held that such an acknowledgement would be insufficient to ascertain a potential juror's beliefs about the death penalty, *Morgan*, 504 U.S. at 734–35, neither of the juror questions at issue queried the jurors' death penalty views. Accordingly, *Morgan* has no bearing on this issue.

¶50        Riley also argues that Arizona Rule of Criminal Procedure 18.5(d) requires trial courts to conduct oral examinations of each juror. Although the rule requires a court to "conduct a thorough oral examination of the prospective jurors and control the voir dire examination," it only requires a court to probe a prospective juror's willingness to follow the law "where the trial judge is left with the *definite impression* that a prospective juror would be unable to faithfully and impartially apply the law" or in cases of "*heightened* danger of juror prejudice or bias" from media exposure. *See Wainright v. Witt*, 469 U.S. 412, 425–26 (1985) (emphasis added); *Bible*, 175 Ariz. at 572 n.12 (emphasis added). These factors are not present here.

ii.        *Lack of Prejudice*

¶51        Even if the trial court erred, Riley "must demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *Moody II*, 208 Ariz. at 451 ¶ 95. "Prejudice will not be presumed but must appear affirmatively from the record." *State v. Hoskins*, 199 Ariz. 127, 141 ¶ 48 (2000). Riley fails to meet this burden.

¶52        Riley claims that the record supports a finding of prejudice resulting from Juror 1's response because it indicated that even though she was willing to follow the law, she did not understand or agree with it. This argument is unpersuasive. Juror 1's initial response indicates that she did not understand the law and was, therefore, confused as to how a defendant could win his case without presenting evidence. This confusion was unquestionably dispelled by the trial court's and both parties' repeated reference to the burden of proof. After being informed of this burden, Juror 1—along with the rest of the panel on October 5, 2015—raised no further questions for clarification.

¶53        Riley also claims the prosecutor's rebuttal closing argument in the guilt phase contributed to the prejudice. At that time, the prosecutor stated:

> I have to say, [the defense attorney]'s right. I've got news for you. Every party has the power to subpoena through the Court any witness. He's right. He has subpoena power. Does that mean

> he has to do it? No. Of course not. I have the
> burden of proof. I always do. But just as we can
> say no inmates testified to—that Tommy Riley
> did it, no inmates testified that Tommy Riley
> wasn't there. No inmates from A Pod testified
> that, "Hey, you know what? I saw him. He
> wasn't in C Pod."

According to Riley, these statements were "tailored to appeal to Juror 1's belief" because they insinuated that Riley failed to call witnesses to support his defense. This argument is equally unpersuasive. A prosecutor may properly comment on a defendant's failure to present exculpatory evidence which would substantiate defendant's theory, provided the remark is not a comment on the defendant's silence. *State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160 (1987).

¶54 Here, the prosecutor merely commented on Riley's failure to present witnesses to support the theory of his defense. In his closing argument, Riley's attorney stated, "[N]obody came forward to say Riley and [his cellmate Dennis] Levis did this. You heard no eyewitness testimony." Before making the statements at issue, the prosecutor explicitly told the jury, "[A]s the judge told you, [the defendants] are not obligated to put on anything and that never changes. And nothing I say, suggest, it is not a wink and a nod. That never ever changes. We always have the burden." During closing arguments alone, the jury heard numerous times—from the judge, Riley's attorney, and the prosecutor—that the State bore the burden of proof. Nothing in the prosecutor's statements expressly or impliedly directed the jury's attention to Riley's failure to testify. Rather, the prosecutor simply maintained that Riley was free to produce witness testimony favorable to his defense.

¶55 Regarding Juror 16, Riley asserts that he was prejudiced by the juror's bias in favor of law enforcement officers because the "trial court did not ascertain how deeply held her bias was or if she would feel pressured to return a guilty verdict because she was concerned about her deputy father's or her prosecutor sister-in-law's opinion if she did not." But this is not evidence of bias; it is an expression of potential or presumed bias. *See Hoskins*, 199 Ariz. at 141 ¶ 48 ("Prejudice will not be presumed but must appear affirmatively from the record.").

**¶56** In sum, Riley has failed to show that he was prejudiced, and he is not entitled to relief.

### D. Admission of Alleged Inadmissible Evidence

**¶57** Riley argues the trial court erred by admitting evidence in violation of the Arizona Rules of Evidence that, coupled with the prosecutor's arguments, deprived him of a fair trial.

*i. Evidence of Kelly's Time in Protective Custody*

**¶58** The State presented evidence that Kelly was placed in protective custody in 2002, six years before his murder, because he had refused an order to commit violence against another inmate and that his prior protective custody status made him a target of the AB. Riley argues that the trial court erred in admitting this evidence because (1) Kelly's prior custody status was irrelevant; (2) since Kelly's prior protective custody status was irrelevant, the reason given for it—that Kelly was put in protective custody because he "had a target on his back" because he refused to commit a violent act during a previous incarceration—was also irrelevant; and (3) the State failed to establish a foundation that Riley knew that Kelly was previously in protective custody which was a prerequisite to proving Riley's motive. Because Riley did not object to the admission of this evidence at trial, we review these claims for fundamental error. *See Anderson*, 210 Ariz. at 341 ¶ 45.

**¶59** Keland Boggs, a special investigator for the ADOC, testified for the State that "the only sure way to gain membership into the [AB] is to commit a homicide of a target of the [AB]." Boggs further explained that inmates who entered an Arizona prison with gang-related "political ink" and who refused to commit an act of violence to earn that tattoo "could be targeted to be killed" and that they commonly requested protective custody.

**¶60** Officer William Dziadura, an ADOC criminal investigations manager, testified for the State that Kelly had been in protective custody in 2002 after refusing a request from "influential white inmates to assault another inmate." When Kelly refused the request, he was told "to cover up some lightning bolts tattoo that he had on his person or be injured." Officer

Dziadura also testified that inmates in protective custody were "perceived as being weak."

¶61      During his opening statement, the prosecutor noted that Kelly "had a target on his back" because "he refused to commit an act of violence on another inmate." He declared that "in the world of the [AB], that's weakness. And weak inmates are targets for men who want membership in the [AB]." The prosecutor later stated in his penalty phase rebuttal closing argument that "[y]ou don't have two more different people, Sean Kelly, who had to go to protective custody because he wouldn't be a part of that world, and the defendant, who executed him."

¶62      Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . ." Ariz. R. Evid. 401(a). "[M]otive is relevant in a murder prosecution." *State v. Hargrave*, 225 Ariz. 1, 8 ¶ 14 (2010).

¶63      The State's theory was that Riley targeted Kelly because he had spent time in protective custody, which gangs like the AB viewed as a weakness. In fact, Riley described in a letter to another inmate how he was looking for a "golden goose" before he was segregated and how he had to move fast once he got the "green light." More importantly, the State's theory was that Kelly had been in protective custody for refusing to carry out an order from "influential white inmates" and refusing such an order could get an inmate targeted to be killed. This testimony allowed the State to establish Riley's motive for killing Kelly; therefore, Kelly's prior stay in protective custody was relevant.

¶64      Similarly, Riley's argument that the State failed to lay a proper relevance foundation for motive by not proving that he knew that Kelly was previously held in protective custody is unpersuasive. Motive may be proven by circumstantial evidence. *State v. Parker*, 231 Ariz. 391, 407 ¶ 71 (2013). Here, Officer Dziadura testified that Kelly was previously put into protective custody for refusing an order to assault another inmate from "influential white inmates." This supports an inference that Kelly was an AB target. Further, Riley's own letter said that he was "hunting big time" for his "golden goose" and that he was constantly "sending names" for approval but kept being told "no" before he got the "green light." In this context, Riley's lack of direct knowledge of Kelly's prior protective custody status is irrelevant because Riley killed Kelly not because *he* had previously

19

targeted him, but because *the AB* sanctioned the murder and rewarded Riley for killing Kelly. In other words, as Riley's letter makes clear, the AB's motive in killing Kelly may be imputed to Riley. This is strong circumstantial evidence of motive that was properly presented for the jury to weigh its merits.

### ii. Evidence of Kelly's Character

**¶65** Riley also objects to portions of Officer Melissa Vincent's testimony. At one point, Officer Vincent, a Correctional Officer who worked in the control room for Kelly's prison pod, testified regarding Kelly's character, stating "I thought he was one of the better inmates. Always very polite to me, never disrespected me, which a lot of them did. Very easy to get along with, quiet." Riley argues that this testimony regarding Kelly's character was irrelevant. Riley claims this implicitly invited the jury to compare Kelly's character with Riley's.

**¶66** Because Riley objected to the relevance of this portion of Officer Vincent's trial testimony, we examine the trial court's decision regarding those statements for abuse of discretion. *See State v. Steinle*, 239 Ariz. 415, 417 ¶ 6 (2016).

**¶67** Under Arizona Rule of Evidence 404(a)(2), a victim's character for peacefulness may be presented only to *rebut* a claim that the victim was the first aggressor. If the defendant does not claim self-defense and there is no evidence that the victim was the initial aggressor, the victim's aggressive or peaceful character is irrelevant. *State v. Hicks*, 133 Ariz. 64, 68–69 (1982). Here, Riley never admitted that he killed Kelly, in self-defense or otherwise. Riley's defense was that he found Kelly dead in his cell and tried to revive him. Thus, the trial court erroneously admitted evidence of Kelly's character.

**¶68** Because the trial court erred, we must determine if it was harmless error. *State v. Bass*, 198 Ariz. 571, 580 ¶ 39 (2000). As such, the State must show "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Escalante*, 245 Ariz. at 144 ¶ 30 (quoting *State v. Escalante-Orozco*, 241 Ariz. 254, 286 ¶ 126 (2017)). "The standard is an objective one, and requires a showing that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* ¶ 31. "The inquiry . . . is not whether, in a trial that occurred

without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Bible*, 175 Ariz. at 588 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

¶69　　Here, a reasonable jury could not have reached a different verdict. The improperly admitted evidence is inconsequential compared to the properly admitted evidence of Riley's guilt, including that (1) Riley was found with Kelly's blood on him; (2) Riley was found with blood on his clothes; (3) Riley's clothes and ID badge were found at the murder scene; (4) an eyewitness saw Riley in Kelly's housing pod the night of the murder; and (5) Riley hand-wrote a letter graphically detailing Kelly's murder and Riley's quest to become a "patched" AB member by looking for a "golden goose." For these reasons, improper admission of two sentences of testimony concerning Kelly's character for peacefulness was harmless error.

### iii. Rule 403 Violations

¶70　　Riley argues the trial court erred in admitting evidence of Kelly's time in protective custody in violation of Arizona Rule of Evidence 403, which prohibits admission of relevant evidence whose probative value is substantially outweighed by the risk of unfair prejudice. "Unfair prejudice means an undue tendency to suggest decision on an improper basis . . . such as emotion, sympathy or horror." *State v. Schurz*, 176 Ariz. 46, 52 (1993) (internal quotation marks omitted) (quoting Fed. R. Evid. 403).

¶71　　Here, Riley's Rule 403 argument is unavailing because the trial court did not abuse its discretion by admitting relevant motive evidence. Although such evidence likely undermined Riley's defense, it was not admitted to evoke "emotion, sympathy, or horror." *Id.* ("[N]ot all harmful evidence is unfairly prejudicial. After all, evidence which is relevant and material will generally be adverse to the opponent."). There was no Rule 403 violation.

### iv. Officer Vincent's Testimony Regarding the "Atta-Boy" Gesture

¶72　　Officer Vincent also testified that, on the night of the murder, as Riley and Levis were exiting C Pod, she saw Riley pat Levis on the shoulder "kind of atta-boying him" and that Riley looked "happy." Riley

argues that the trial court violated several Arizona Rules of Evidence in admitting this testimony, including Rule 602 because Officer Vincent did not know the significance of Riley's pat on Levis's shoulder; Rule 701(a) because the testimony was not rationally based on Officer Vincent's perception; and Rule 701(b) because the testimony was not helpful to the jury. In sum, Riley contends that Officer Vincent's testimony was not necessary because the jury could determine on its own the significance of Riley's gestures and interactions with Levis.

¶73 Because Riley did not object to the admission of this evidence at trial, we review these claims for fundamental error. *See Anderson*, 210 Ariz. at 341 ¶ 45.

¶74 Riley's argument that Officer Vincent's testimony does not pass muster under Rule 602 is unpersuasive. The rule provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ariz. R. Evid. 602. In essence, Rule 602 permits a witness's observation testimony. Here, Officer Vincent's testimony was based on her own perception and her characterization of a pat on the back and a smile as a congratulatory gesture is unremarkable.

¶75 Officer Vincent's testimony also did not violate Rule 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue . . . .

*See State v. King*, 180 Ariz. 268, 280 (1994) (reasoning that a witness's opinion as to whether a person depicted on video was the defendant was admissible under Rule 701 because it was based on his perception and "assisted the jury in determining a fact in issue—the identity of the person on the videotape"). Officer Vincent's testimony did not violate Rule 701(a) because her opinion was rationally based on her perception that Riley's smile and pat of Levis's back was congratulatory.

¶76        Officer Vincent's testimony was also admissible under Rule 701(b) because it was helpful to aid the jury's understanding of a fact at issue. Riley contends that he was in Kelly's housing pod the night of the murder because he intended to warn him of the murder plot. Upon discovering that Kelly was dead, Riley claimed that he panicked and "took off." The State contested Riley's explanation. Officer Vincent's testimony assisted the jury in determining this fact because her description of Riley's behavior is inconsistent with a panicked man—as Riley claimed to be—and tended to prove the State's theory of the case. Further, contrary to Riley's claim, the jury was not in the same position as Officer Vincent to discern the significance of Riley's "atta-boy" or "happy" expression because she was the only percipient witness to the interaction. Officer Vincent's testimony provided information to assist the jury in determining Riley's role in Kelly's murder. For these reasons, the trial court did not err in admitting Officer Vincent's testimony.

              *v.*        *Comparison of the Worth of Kelly's Life with Riley's*

¶77        Riley argues that when the prosecutor stated in his penalty phase rebuttal closing argument "[y]ou don't have two more different people, Sean Kelly, who had to go to protective custody because he wouldn't be a part of that world, and the defendant, who executed him," he impermissibly compared the value of Riley's and Kelly's lives. Riley did not object so we review for fundamental error. *See Anderson*, 210 Ariz. at 341 ¶ 45.

¶78        This argument is unpersuasive because the statement did not compare the value of Kelly's and Riley's lives. Instead, the prosecutor merely urged the jury to reject Riley's suggestion that it should consider the violent prison environment as mitigation because Riley and others involved in the AB created the "kill-or-be-killed" environment and that, unlike Riley, Kelly had rejected that culture. Likewise, any error was harmless in light of the substantial evidence of Riley's guilt.

       **E.    Inclusion of Duress Defense in Guilt-Phase Jury
              Instructions**

¶79        Riley argues the trial court erred by instructing the jurors that duress is not a defense to first degree murder. Because Riley did not object

to the jury instructions, we review this claim for fundamental error. *See Hunter*, 142 Ariz. at 90.

¶80 On November 2, 2015, during a conference to discuss jury instructions, the prosecutor requested to add an instruction that duress is not a defense to first degree murder. Defense counsel claimed they would not be raising the duress defense, but agreed to the instruction's inclusion. Before the trial court read the final instructions to the jury, defense counsel again approved the instruction. The court instructed the jurors that "[a] person compelled to commit a crime by the threat or use of immediate force against that person is not justified in committing the crime if it involved homicide or serious physical injury."

¶81 Throughout the trial, the State produced evidence that AB probates, like Riley at the time of the murder, were not at liberty to refuse orders and that Kelly had previously been in protective custody after he received threats from "influential white inmates" for refusing to carry out an assault on another inmate. The State argues that the duress instruction "clarified any misconception the jurors may have developed that Riley would not be criminally responsible for killing Kelly if he had acted under threat from the [AB]."

¶82 The State concedes that no reasonable juror would have believed that Riley acted under duress, and neither the State nor Riley relied on a theory of duress. During closing arguments, defense counsel specifically addressed the duress instruction and noted that it would not "come into play" because "nobody has said that Mr. Riley was compelled to commit this crime by threats or use of force. That has never come out ever, not even in the slightest."

¶83 "A party is entitled to any jury instruction reasonably supported by the evidence." *State v. Burns*, 237 Ariz. 1, 17 ¶ 48 (2015). But the giving of an abstract instruction, which "broadens the issues beyond the scope of the evidence and thus impliedly submits to the jury issues and questions not properly before it," constitutes error. *See State v. Willits*, 96 Ariz. 184, 190–91 (1964); *Glenn v. Chenowth*, 71 Ariz. 271, 273–74 (1951) (holding a self-defense instruction was improper in a civil suit where neither party asserted such a claim and "[t]he instruction was susceptible of conveying the impression to the jury that the trial judge may possibly have thought that [the plaintiff] had been attacked by [the defendant]").

¶84        Here, although neither party relied on a theory of duress, the trial court did not err in giving the duress instruction because, without it, the jury could have improperly concluded that Riley killed Kelly to avoid physical harm by the AB.  Courts may instruct a jury under these circumstances to minimize the risk that a jury will base its verdict on an erroneous legal assumption.  *See, e.g.*, *State v. Champagne*, 247 Ariz. 116, 137 ¶ 60 (2019) (holding the trial court did not commit instructional error when, "without the voluntary intoxication instruction the jury could have rejected [defendant]'s claim of innocence but improperly concluded that his voluntary intoxication prevented him from forming the necessary intent for criminal liability").

¶85        Nevertheless, even if the trial court erred in giving the duress instruction, such error was not fundamental because it did not amount to a comment on the evidence by the trial judge.  A judge violates Arizona's constitutional prohibition against commenting on evidence by expressing "an opinion as to what the evidence proves," in a way that interferes "with the jury's independent evaluation of that evidence."  *State v. Rodriguez*, 192 Ariz. 58, 63 ¶¶ 28–29 (1998); *see also* Ariz. Const. art. 6, § 27.  An abstract instruction may amount to a comment on the evidence if the instruction indicates the trial judge's opinion regarding some evidence of the case.  *See Chenowth*, 71 Ariz. at 273–74.

¶86        Contrary to Riley's argument, the duress instruction did not amount to a comment on the evidence.  Unlike the instruction in *Chenowth*, where the self-defense instruction could have indicated to the jury that the judge had formed an opinion about who hit whom first, the duress instruction here carried no such implication.  Riley asserts that the instruction implied that the judge believed there was evidence of duress, and because Riley's defense that he intended to warn Kelly of an impending attack was the only evidence that came close to the issue of duress, the instruction further implied that the jury should not consider Riley's defense.

¶87        But this argument is unpersuasive for several reasons.  First, the trial court expressly informed the jury, prior to closing arguments, that they could disregard inapplicable instructions.  Second, the prosecutor did not state or imply that Riley may have acted under duress, and defense counsel expressly informed the jury that the duress instruction did not

apply. Third, Riley's letter discussing Kelly's murder provided overwhelming evidence that Riley did not act under duress. Finally, no reasonable juror would have discounted Riley's defense based on the duress instruction because Riley's entire defense rested on the premise that he did not kill Kelly. The sole purpose of the duress instruction was to accurately inform the jury that a defendant cannot rely on duress to justify a killing. *See* A.R.S. § 13-412(C). Because Riley's defense did not rely on any such justification, the instruction did not impact his defense.

¶88 In any event, even if the error were fundamental because it went to the foundation of the case or deprived him of an essential right, *see Escalante*, 245 Ariz. at 142 ¶ 21, Riley failed to show prejudice. Riley argues that the abstract instruction was prejudicial by misleading and confusing the jury because it raised a significant possibility that jurors believed they could not consider Riley's defense. For the same reasons stated above, this argument is unpersuasive. The trial court informed the jurors that they could—and they presumably did—disregard any inapplicable instructions. Moreover, Riley has pointed to no evidence in the record indicating he was prejudiced by the duress instruction, but rather asks us to speculate that the jurors were misled or confused by the instruction. *See State v. Broughton*, 156 Ariz. 394, 397–98 (1988) (holding that prejudice requires a showing of more than mere speculation); *State v. Munninger*, 213 Ariz. 393, 397 ¶ 14 (App. 2006) (holding that defendant could not show prejudice through speculation). Accordingly, Riley is not entitled to relief on this issue.

### F. Sufficiency of the (F)(13) Aggravator Instruction

¶89 Riley argues that the trial court's failure to include, in the § 13-751(F)(13) aggravator jury instruction, a baseline statement that all first degree murders are cold and calculating to some extent rendered the instruction insufficient to narrow the aggravator because it allowed the jury "to begin with the assumption that there are premeditated first degree murders that are not cold and calculating and that any evidence of the cold and calculating component would be sufficient to find the aggravator."

¶90 Although we generally "review de novo whether jury instructions adequately state the law," *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 30 (2010) (quoting *State v. Tucker*, 215 Ariz. 298, 310 ¶ 27 (2007)), "absent an objection by the defendant, we review for fundamental error," *Velazquez*, 216 Ariz. at 309–10. Here, because Riley does not challenge the instruction

as an inadequate statement of the law but rather as an inadequate narrowing of a facially vague aggravator, his failure to object to the instruction means "he is not entitled to relief unless he can show fundamental error." *See Hausner*, 230 Ariz. at 83 ¶ 107.

¶91 Concerning the (F)(13) aggravator, the trial court instructed the jurors as follows:

> The State alleges that the murder was committed in a cold, calculated manner without pretense of moral or legal justification. This aggravating circumstance requires more than the premeditation necessary to find a defendant guilty of first degree murder. This aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the defendant exhibited a cold-blooded intent to kill that is more contemplative, more methodical, more controlled than that necessary to prove premeditated first degree murder. In other words, a heightened degree of premeditation is required.
>
> "Cold" means the murder was the product of calm and cool reflections.
>
> "Calculated" means having a careful plan or prearranged design to commit murder.
>
> This aggravating circumstance focuses on the defendant's state of mind at the time of the offense, as reflected by the defendant's words and acts. To determine whether a murder was committed in a cold, calculated manner without pretense of moral or legal justification, you must find that the State proved beyond a reasonable doubt that the defendant:

  1. Had a careful plan or prearranged design to commit murder before the fatal incident; and

  2. Exhibited a cool and calm reflection for a substantial period of time before killing; and

  3. Had no pretense of moral or legal justification or excuse.

  A "pretense of moral or legal justification" is any claim of justification or excuse that, though insufficient to reduce the degree of murder, nevertheless rebuts the otherwise cold, calculated nature of the murder.

Thus, the (F)(13) aggravator qualifies a first degree murder for the death penalty if "[t]he offense was committed in a cold, calculated manner without pretense of moral or legal justification." A.R.S. § 13–751(F)(13) (2012). The jury found this aggravator beyond a reasonable doubt.

**¶92** We addressed the constitutionality of Arizona's (F)(13) aggravator in *Hausner*. Relying on the rationale of a Florida case that analyzed the constitutionality of a substantially similar aggravator, we held that the (F)(13) aggravator was facially vague. *Hausner*, 230 Ariz. at 82 ¶ 102 (citing *Jackson v. State*, 648 So. 2d 85 (Fla. 1994)). But, like the court in *Jackson*, we subsequently held that the instruction provided to the jury there adequately narrowed the aggravator. *Id.* at 83 ¶ 105. Noting that the trial court provided "narrowing instructions substantially the same as those approved in *Jackson*," we reasoned that the (F)(13) instruction "clarified to the jury that 'all first degree premeditated murders are, to some extent, committed in a cold, calculated manner,' but distinguished this aggravator as one that 'cannot be found to exist unless . . . the defendant exhibited a cold intent to kill and is more contemplative, more methodical, more controlled than that necessary to commit premeditated first degree murder.'" *Id.* ¶ 104 (citation omitted).

**¶93** The instruction further defined the terms "cold" and "calculated" and "emphasized that the jury must look to the defendant's

state of mind at the time of the offense to determine whether there exists any pretense of moral or legal justification that rebuts cold and calculated . . . ."  *Id.*  The instruction also required the jury to "find beyond a reasonable doubt that there is (1) a careful plan or prearranged design before the murder, and (2) a cool and calm reflection for a substantial period of time before the murder."  *Id.*  We ultimately concluded "[t]his instruction adequately narrowed the aggravator, making it clear that it is not the cold and calculated nature of *every* murder that will satisfy it, but that the jury must find some degree of reflection and planning that goes *beyond* the premeditation required to find first degree murder."  *Id.* ¶ 105.

¶94    Here, the (F)(13) instruction provided to Riley's jury was materially identical to the *Hausner* instruction with one exception: the instruction here did not include the baseline statement that all first degree murders are cold and calculating to some extent.  Riley's argument that the absence of this statement renders the instruction insufficient to constitutionally narrow the aggravator is unpersuasive for several reasons.

¶95    First, the instruction from the Florida Supreme Court to which we approvingly compared the *Hausner* instruction did not contain any such baseline statement. *See Jackson*, 648 So. 2d at 89–90, 89 n.8.  Second, the instruction here expressly stated that the aggravator "require[d] more than the premeditation necessary to find a defendant guilty of first degree murder" and required the jury to find "a heightened degree of premeditation" as compared to first degree murder.  Finally, like the instruction in *Hausner*, it expressly defined "cold" and "calculated" and further distinguished the aggravator from other first degree murders by requiring a finding that the murder was "more contemplative, more methodical, [and] more controlled than that necessary to prove premeditated first degree murder."  These numerous distinctions between the aggravator and other first degree murders satisfy *Hausner*'s requirement that a proper instruction must inform the jury that it "must find some degree of reflection and planning that goes *beyond* the premeditation required to find first degree murder." *See Hausner*, 230 Ariz. at 83 ¶ 105.

¶96    If we were to determine that the absence of the baseline statement renders the instruction insufficient to narrow the aggravator, such an error would unquestionably be fundamental.  *See, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("[C]hanneling and limiting of the

sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."). But because Riley contends that this error went to the foundation of his case or deprived him of a right essential to his defense, it would not require reversal because Riley failed to show prejudice. *Escalante*, 245 Ariz. at 140 ¶ 16; *see also Henderson*, 210 Ariz. at 568 ¶ 24. The evidence produced at trial overwhelmingly established that Riley acted in a cold and calculated manner that exceeded the norm of first degree murders. The contents of his letter, corroborated by the evidence from the night of the murder, show that Riley actively sought out a potential target, requested permission from the AB leadership to kill his target, ignored the advice from other inmates who discouraged his plans, and concocted a plan to get in and out of Kelly's pod and cell. He also packed his belongings and changed his mailing address in anticipation of repercussions from completing the murder.

¶97 In sum, the (F)(13) instruction provided to the jury sufficiently narrowed the facially vague aggravator; therefore, the instruction, as provided, did not constitute error. Even if the lack of a baseline statement did constitute fundamental error, Riley did not suffer prejudice.

## G. Constitutionality of the (F)(6) Aggravating Factor

¶98 The § 13-751(F)(6) aggravator provides: "The defendant committed the offense in an especially heinous, cruel or depraved manner." Riley argues that the (F)(6) aggravator is unconstitutional for two reasons: (1) this Court's lack of finite limitations on the (F)(6) aggravator render it unconstitutionally vague; and (2) any meaningful guidance, if it does exist, cannot be adequately conveyed through jury instructions. We review the constitutionality of aggravating factors de novo. *State v. Nelson*, 229 Ariz. 180, 186 ¶ 25 (2012).

¶99 In January 2015, Riley filed a pre-trial motion to strike the (F)(6) aggravator, in part, for the same reasons articulated above. The trial court subsequently rejected Riley's motion. At trial, the jury instructions—approved by Riley—read as follows:

> Concerning this aggravating circumstance, all
> first degree murders are, to some extent,
> heinous, cruel or depraved. However, this

aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was "especially" cruel, "especially" heinous or "especially" depraved. "Especially" means "unusually great or significant."

The term "especially cruel," or "especially heinous or depraved" are considered separately; therefore, the presence of any one circumstance is sufficient to establish this aggravating circumstance. However, to find that this aggravating circumstance is proven, you must find that "especially cruel" has been proven unanimously beyond a reasonable doubt or that "especially heinous or depraved" has been proven unanimously beyond a reasonable doubt.

The term "cruel" focuses on the victim's pain and suffering. To find that the murder was committed in an "especially cruel" manner, you must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death. The defendant must know or should have known that the victim would suffer.

The term "especially heinous or depraved" focuses upon the defendant's state of mind at the time of the offense, as reflected by the defendant's words and acts. A murder is especially heinous if it is hatefully or shockingly evil; in other words, grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion or deterioration.

The instructions further defined "relishing," "gratuitous violence," and "mutilation." At the end of the aggravation phase, the jury unanimously

found that the State had proved that Riley committed the murder in both an especially cruel manner and an especially heinous or depraved manner.

¶100    In *State v. Gretzler*, this Court described circumstances, or factors, which narrowed the meaning and constitutional application of the "especially heinous, cruel, or depraved" aggravators. 135 Ariz. 42, 50–53 (1983). In *Walton v. Arizona*, the Supreme Court found this aggravating factor facially vague, but it held that *Gretzler*'s definition of the provision rendered it "constitutionally sufficient because it [gave] meaningful guidance to the sentencer." 497 U.S. 639, 654, 655 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Although Riley does not argue that *Walton* was wrongly decided, he contends it no longer protects the constitutionality of Arizona's (F)(6) aggravator because "[t]he Supreme Court's . . . justifications for upholding Arizona's vague [(F)(6)] aggravator no longer exist."

¶101    First, Riley contends that our interpretation of the *Gretzler* factors as non-exclusive guides contradicts the Supreme Court's reliance on *Gretzler* as a finite list of limiting factors. *See Walton*, 497 U.S. at 655 (finding this Court's definitions of the (F)(6) aggravators to be constitutionally sufficient). Contrary to Riley's argument, the Supreme Court has noted that this Court did not view the *Gretzler* factors as an exclusive list. Indeed, *Walton* expressly noted the availability of multiple constructions of the (F)(6) aggravator that would be "constitutionally acceptable." *Id.* (citing *Maynard*, 486 U.S. at 365); *id.* at 695 (Blackmun, J., dissenting) ("Since its decision in *Gretzler*, the Arizona Supreme Court has continued to identify new factors which support a finding that a particular murder was heinous or depraved."). Our expansion of the *Gretzler* factors, therefore, does not render its guidance—embodied in the jury instructions—any less meaningful.

¶102    Second, Riley contends "[t]his Court has affirmatively created more of a constitutional problem by removing any meaning from the word 'especially.'" He argues the dictionary definition of *especial* and our historical analysis of the (F)(6) aggravator requires that a "jury must be able to compare the factor against the norm" or the "prototypical murder." Although the jury instructions included a definition of "especially," Riley maintains a mere definition of the word "give[s] the jury no way to determine whether the [defendant's] conduct meets this definition." Effectively, Riley is making an argument we rejected in *State v. Johnson*:

"that the term 'especially' in [§ 13-751(F)(6)][3] essentially requires some kind of comparison between death-eligible murder cases and the 'norm.'" 212 Ariz. 425, 431–32 ¶¶ 19–20 (2006) (rejecting that argument based on this Court's prior rejection of proportionality review).

**¶103** Riley errs here by patching together a non-existent "above the norm test" that effectively revives proportionality review, which we abandoned in *State v. Salazar*, 173 Ariz. 399, 416–17 (1992). Undoubtedly, as Riley argues, the death penalty "should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" *See State v. Carlson*, 202 Ariz. 570, 582 ¶ 45 (2002) (quoting *Hoskins*, 199 Ariz. at 163 ¶ 169); *see also State v. Andriano*, 215 Ariz. 497, 506 ¶ 43 (2007) *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012) ("[J]urors must assess whether the murder was so cruel that it rose above the norm of first degree murders."). But we have never held that a jury must *compare* one murder to another, and we have expressly rejected the argument that juries must be informed of any comparison to the "norm." *See State v. Bocharski*, 218 Ariz. 476, 487–88 ¶¶ 47–50 (2008).

**¶104** Indeed, by providing statutory aggravators and constitutionally acceptable definitions to the terms "especially heinous, cruel, or depraved," the legislature and this Court have provided juries with the means to distinguish a murder that satisfies the (F)(6) aggravator from the "norm." *See Carlson*, 202 Ariz. at 582 ¶ 45; *see also State v. Hidalgo*, 241 Ariz. 543, 551–52 ¶¶ 27–28 (2017) (noting that Arizona's death penalty scheme provides several means of narrowing the class of death-eligible persons). In other words, the specific, thorough definitions as to what constitutes "especially heinous, cruel, or depraved" murder necessarily imply that "normal" murders do not meet these definitions; thus, juries do not require any comparison of the facts before them to other murders. Although Riley may be correct in stating "[t]he 'above the norm' standard in the (F)(6) is not and never has been a proportionality review," the standard to which he is referring has never required juries to compare the facts of one murder against another. This standard is satisfied by constitutionally acceptable jury instructions that provide meaningful guidance to the jury.

---

[3] Previously A.R.S. § 13-703(F)(6).

**¶105** Finally, to the extent that Riley challenges the constitutional sufficiency of the definitions provided in the jury instructions, we have repeatedly upheld jury instructions materially identical to those here. *See, e.g.*, *State v. Medina*, 232 Ariz. 391, 408–09 ¶¶ 74–75 (2013); *State v. Prince*, 226 Ariz. 516, 531–33 ¶¶ 48–54 (2011); *Gallardo*, 225 Ariz. at 566 ¶¶ 21–23; *State v. Chappell*, 225 Ariz. 229, 237–38 ¶ 27 (2010); *State v. Pandeli* ("*Pandeli III*"), 215 Ariz. 514, 523–24 ¶¶ 20–21 (2007).

**¶106** Assuming our jurisprudence has provided meaningful guidance, Riley argues that guidance cannot be "adequately reduced to a jury instruction." Although Riley attempts to introduce a novel argument here—contrasting the *descriptive* nature of this guidance against the *prescriptive* nature of jury instructions—we have repeatedly held that the (F)(6) aggravator may be constitutionally applied if given substance and specificity by jury instructions that follow our constructions. *See Anderson*, 210 Ariz. at 352–53 ¶¶ 109–14; *see also Hargrave*, 225 Ariz. at 13 ¶ 44; *Andriano*, 215 Ariz. at 505 ¶ 38; *State v. Tucker*, 215 Ariz. 298, 310 ¶ 28 (2007); *Cromwell*, 211 Ariz. at 188–89 ¶¶ 40–42.

**¶107** Riley first posits "[t]he rationale of *Walton* does not apply to jury sentencing" because *Walton* was decided at a time when the sentencers in Arizona were trial judges, who "are presumed to know the law and apply it in making their decisions." He focuses once more on the word "especially," arguing that the descriptive nature of our guidance grants trial judges—but not juries—the necessary context to distinguish between "normal" murders and "especially heinous, cruel, or depraved" murders. But we rejected a similar argument in *Cromwell*, stating "Supreme Court case law . . . dispels that notion because it distinguishes constitutional statutes from unconstitutional statutes on the basis of the clarifying definition, not on the supposition that judges may apply the statute one way and jurors another." 211 Ariz. at 189 ¶ 44 (citing *Maynard*, 486 U.S. at 365). Because the Supreme Court has held constitutional our definitions of the (F)(6) aggravator, jury instructions that convey those definitions with adequate specificity protect the constitutionality of the (F)(6) aggravator when a jury, rather than a judge, conducts the fact-finding.

**¶108** Relying on one sentence from *Newton v. Main*, Riley also contends jury instructions must be prescriptive. *See* 96 Ariz. 319, 321 (1964) ("The test to be used in determining the correctness of instructions is whether upon the whole charge the jury will gather the proper rules to be

applied in arriving at a correct decision.").  He argues that jury instructions must "establish a formula into which a sentencer might insert facts to determine the existence of an . . . aggravating factor."  Therefore, according to Riley, our *descriptive* guidance cannot satisfy this requirement.

**¶109**　　　　Our discussion on jury instructions in *Newton* does not support this novel proposition.  Both *Newton* and the cases upon which it relied examined jury instructions for *correctness*—that is, for correct statements of the law.  *See Newton*, 96 Ariz. at 320; *see also Musgrave v. Githens*, 80 Ariz. 188, 192–93 (1956); *Daly v. Williams*, 78 Ariz. 382, 387 (1955).  Nothing in *Newton* or any other Arizona case suggests that courts must provide juries with formulaic plug-and-play instructions.

**¶110**　　　　In sum, Riley has provided no valid arguments challenging the constitutional sufficiency of our guidance regarding Arizona's (F)(6) aggravator or the constitutional applicability of the aggravator by a jury, rather than a judge.  Accordingly, Riley is not entitled to relief on this issue.

### H.　　Inclusion of the Accomplice Liability Instruction During Aggravation Phase

**¶111**　　　　Riley argues that the prosecutor's recitation of the guilt-phase accomplice liability instruction ("accomplice instruction") in the aggravation phase violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because they contradicted the jury instructions for the (F)(6) and (F)(13) aggravators and lessened the State's burden to prove those aggravators beyond a reasonable doubt.  Although Riley initially objected to the prosecutor's introduction of the accomplice instruction, he withdrew that objection.  Because Riley did not object to the reference to the accomplice jury instruction, we review for fundamental error.  *See Anderson*, 210 Ariz. at 341 ¶ 45.

**¶112**　　　　During the trial's aggravation phase, Riley's attorney made several statements that seemed to contest his guilt.  Specifically, Riley's attorney stated:

> Let's look at the evidence.　When Dr. Hu testified, he can't say what wounds—or who caused the wound exactly.　And he can't say

when Sean Kelly was unconscious. It could have been the first wound.

. . . .

No gratuitous violence. You see [sic] and you heard testimony there were other people involved in this. Other people involved. If there is [sic] other people involved, how do we know beyond a reasonable doubt—which is the law—that Mr. Riley was the one who caused all this infliction or violence to Mr. Riley? [sic] Who can say that? I wasn't there. The State wasn't there.

¶113 To counter these statements, the prosecutor read, on rebuttal, an excerpt from the guilt-phase accomplice instruction, stating:

The defendant is criminally accountable for the conduct of another if the defendant is an accomplice of such other person in the commission of the offense, including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice.

Riley initially objected to the prosecutor's statement, but he withdrew his objection once he understood that the prosecutor was reading from the guilt-phase instruction.

¶114 After reading the accomplice instruction, the prosecutor remarked:

In other words, if you're in for a penny, you're in for a pound. You do not need to know which wound was inflicted by Thomas Riley. That's not the law that the judge gave you.

The law in the state of Arizona is that if you and your accomplices go out and start stabbing somebody, you don't get to run to the jury and say: Oh, I don't know which one I inflicted.

36

> In for a penny, in for a pound. That is the law. And these guys were working in concert with each other. By the defendant's own admission, he stabbed the most. You do not need to focus on which one did what. The law doesn't make that distinction.
>
> And that makes sense. You don't get the benefit that: I stabbed him too many times. I couldn't keep track.
>
> You don't get that benefit. That is not the law.
>
> So go back and look at your instructions. But on page 29, you will see: If you and your accomplices are—if you're the lookout and they're in there, you are still accountable. That's the law. And it's right there in black and white, page 29.

¶115 Riley argues that the prosecutor's reading of the accomplice instruction, combined with his statements on accountability, amounted to an instruction to the jury about how it should weigh the evidence presented during the aggravation phase. Riley contends this was fundamental error because the accomplice instruction and the aggravation-phase instructions conflict: The accomplice instruction allows for a conviction based on a co-conspirator's actions, but the aggravation instructions require the jury to find that the defendant individually had the requisite mens rea. He further argues that this was fundamental error because it relieved the State of its burden to prove Riley had the requisite mens rea for the (F)(6) and (F)(13) aggravators. Finally, Riley argues that the inclusion of the accomplice instruction was prejudicial because the (F)(6) and (F)(13) aggravators were the "most powerful aggravators" found, and without them a reasonable jury could have sentenced Riley to life, not death.

¶116 The State's introduction of the guilt-phase accomplice instruction in the aggravation phase did not constitute an error, much less a fundamental one. Riley's statements regarding causation could be construed to contest his guilt rather than the aggravating factors. It was

proper, therefore, for the prosecutor to rebut those statements by drawing the jury's attention to the guilt-phase accomplice instruction. *See* A.R.S. § 13-751(D) ("The prosecution and the defendant shall be permitted to rebut any information received at the aggravation or penalty phase of the sentencing proceeding and shall be given fair opportunity to present argument as to whether the information is sufficient to establish the existence of any of the circumstances included in subsections F and G of this section.").

**¶117** But even assuming that the introduction of the accomplice instruction constituted fundamental error that went to the foundation of his case or deprived him of a right essential to his defense, Riley failed to show that he was prejudiced. To prove prejudice, he has the burden of showing that a reasonable jury could have come to a different verdict. *See Escalante*, 245 Ariz. at 144 ¶ 29. Riley failed to meet that burden.

**¶118** After the aggravation phase, the jury had sufficient evidence to find the State proved the (F)(6) and (F)(13) aggravators beyond a reasonable doubt. No reasonable jury would have found the murder—a stabbing death with over 100 stab wounds inflicted with prison shanks—was not conducted in a cruel, heinous, and depraved manner. Likewise, Riley's letter shows that he planned the murder beforehand and that his motive was to become a patched member of the AB, demonstrating along with other evidence that the murder was "committed in a cold, calculated manner without pretense of moral or legal justification." A.R.S. § 13-751(F)(13) (2012).

**¶119** Although Riley asserts that the jury would not have found these aggravators absent the accomplice instruction, nothing in the record supports that assertion. Taken altogether, the evidence discussed above was more than sufficient to allow the jury to find beyond a reasonable doubt—before the prosecutor introduced the accomplice instruction—that the State proved the (F)(6) and (F)(13) aggravators. Even if this Court ignores the fact that the prosecutor read the accomplice instruction to rebut Riley's re-litigation of his guilt during the aggravation phase, Riley's letter served to prove these aggravators regardless of whether the accomplice instruction was presented erroneously.

**¶120** Accepting Riley's argument that the jury would not have found the (F)(6) and (F)(13) aggravators absent the accomplice instruction,

Riley still would be unable to prove that the outcome (i.e., the jury's death sentence verdict) could have been different. The jury found the State proved three other aggravators beyond a reasonable doubt, and Riley does not challenge them. Rather, he argues that the remaining aggravators— conviction of a prior serious offense, current offense committed in custody, and current offense committed to promote a criminal street gang—were weaker aggravators and intrinsic to the offense. And according to Riley, a reasonable jury left with only these "weaker" aggravators could have rendered a life sentence rather than a death sentence.

**¶121** To support his argument, Riley cites to *State v. Willoughby*, where we stated that the quality of the aggravating factor should be considered when weighing aggravators against mitigation evidence. 181 Ariz. 530, 549 (1995). But against his counsel's advice, Riley waived his right to present mitigation evidence—there was little for the jury to weigh the aggravators against. Under these circumstances, in which Riley committed an in-custody murder to promote a violent gang, even absent the (F)(6) and (F)(13) aggravators, he failed to carry his burden to show that a reasonable jury could have reached a different conclusion. *See Escalante*, 245 Ariz. at 144 ¶ 29; *see also Hausner*, 230 Ariz. at 84 ¶ 114 (finding that even if an (F)(13) aggravator was improperly considered by the jury, the three remaining, proven aggravators were sufficient for the jury to render a death sentence).

**¶122** Riley also challenges the prosecutor's statement accompanying his introduction of the guilt-phase accomplice instruction wherein he told the jury that Riley was accountable for the actions of his co-conspirators. As discussed, *supra* ¶ 116, the prosecutor's comments are not improper because they properly rebutted Riley's counsel's statements which addressed Riley's guilt, not his mindset. *See* § 13-751(D). But Riley is correct that his guilty verdict for first degree murder does not relieve the State of its burden of proving, at the aggravation stage, his level of involvement in the murder and his mindset in relation to the (F)(6) and (F)(13) aggravators. *See State v. Garcia*, 224 Ariz. 1, 13 ¶ 44 (2010) (noting that Arizona law "specifically requires the trier of fact to make *Enmund/Tison* findings in the aggravation phase.") (quoting *State v. Garza*, 216 Ariz. 56, 67 ¶ 46 (2007)). However, we find no error, fundamental or otherwise, because Riley does not allege *Enmund/Tison* error and evidence of his involvement in Kelly's murder is overwhelming.

¶123 In sum, the prosecutor's comments were proper to rebut the re-litigation of Riley's guilt. Even if the comments were an error, Riley has failed to carry his burden of proving a reasonable jury could have found a death sentence inappropriate.

## I.    Prosecutorial Misconduct

¶124 Riley argues that several of the prosecutor's statements constitute misconduct because they deprived him of his due process and fair trial rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and article 2, sections 4 and 24 of the Arizona Constitution.

¶125 "In determining whether an argument is misconduct, we consider two factors: (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks." *Goudeau*, 239 Ariz. at 466 ¶ 196 (internal quotation marks omitted). Because Riley did not object to the statements below, we review for fundamental error. *See Anderson*, 210 Ariz. at 341 ¶ 45.

> *i.    Juror Questionnaire's Description of Aggravating Factors and Inclusion of Accomplice Liability Instructions in Aggravation Phase*

¶126 Riley contends that the jury questionnaire's description of aggravating factors as "very few" and "very specific" constitutes prosecutorial misconduct. We note this is barren soil for such a claim since the trial court must approve the questionnaire. In any event, as discussed, *supra* ¶¶ 24–36, while there was error in this description of Arizona's aggravating factors, it was not fundamental. Similarly, Riley argues that the prosecutor's inclusion of the accomplice liability instruction during aggravation phase constitutes prosecutorial misconduct. As we explain above, *supra* ¶¶ 111–23, there was no error, and even if there were, it was not fundamental. Accordingly, Riley's argument on this point is unavailing.

> *ii.    Prosecutor's Statements Regarding "Crossing the Line"*

¶127 During the defense's penalty-phase closing argument, defense counsel argued that the death penalty is meant for truly heinous

murderers like Ted Bundy, Jeffrey Dahmer, Charles Manson, Timothy McVey, etc., stating:

> The worst of the worst. That is what [the death penalty] is reserved for. That is who the death penalty was founded for, the worst of the worst. It was founded for Timothy McVey, the Oklahoma Bomber. You see how the death sentence is applied to the worst of the worst. Mr. Riley is not the worst of the worst for our society.

In rebuttal, the prosecutor stated, "[I]t is standard practice to talk about Jeffrey Dahmer and Charles Manson and everything else, but the law doesn't care how far you cross the line. The law only matters [sic] that you cross it." Riley argues that this comment misstated the law because simply killing another person does not mean that the death penalty is warranted and that the misstatement "so infected the trial with unfairness as to make the resulting conviction a denial of due process" because the trial court did not correct it.

¶128 Riley also argues that these statements constitute fundamental error because they lessened the burden on the State to prove aggravators. However, as the State points out, the statements were made in the penalty phase—after the jury had already found aggravators—so they could not have lessened the burden of proving aggravators.

¶129 "Prosecutors are given 'wide latitude' in presenting closing argument to the jury." *Goudeau*, 239 Ariz. at 466 ¶ 196. "[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *United States v. Young*, 470 U.S. 1, 12–13 (1985); *see also State v. Alvarez*, 145 Ariz. 370, 373 (1985) ("Prosecutorial comments which are a fair rebuttal to areas opened by the defense are proper.").

¶130 Riley's argument is unpersuasive. Riley's comments that the death penalty is "reserved" for the "worst of the worst" like mass murderers and serial killers is clearly contrary to the law, and those comments could have led the jury to believe that they could not vote for the death penalty because Riley is neither a mass murderer nor a serial killer.

41

Riley's comments invited the prosecutor to respond to "right the scale." *See Young*, 470 U.S. at 12–13. Thus, the prosecutor's comments did not draw "the jury's attention [to] matters it should not have considered in reaching its decision." *See Goudeau*, 239 Ariz. at 466 ¶ 196 (quoting *Nelson*, 229 Ariz. at 189 ¶ 39). And if the statement influenced the jury, it influenced it to the legally correct conclusion: One does not have to be a mass murderer or serial killer to receive the death penalty. The prosecutor acted well within his "wide latitude" in his response and there is no error here.

> *iii.* *Prosecutor's Statements Allegedly Unsupported by Evidence*

**¶131** Riley contends that the prosecutor engaged in misconduct by making several comments unsupported by the evidence during the guilt and penalty trial phases, resulting in fundamental, prejudicial error. "Specific evidence may be referenced in the opening statement as long as the proponent has a good faith basis for believing the proposed evidence exists and will be admissible." *State v. Pedroza-Perez*, 240 Ariz. 114, 116 ¶ 12 (2016). We address in turn each of the prosecutor's contested statements.

**¶132** First, the prosecutor stated in his guilt-phase opening statement, "Now, Sean Kelly was just a guy. He was in prison because he's [sic] a drug addict and he was caught in the revolving door of prison, addiction, prison, even though he had a loving family that cared for him." That Kelly had a loving family was later corroborated by the victim impact statements of his former fiancé and their daughter. Although no evidence was presented to show that Kelly was a drug addict or that he was caught in a "revolving door of prison," no misconduct occurred because there was a very low probability that the prosecutor's statement would improperly influence the jury by characterizing Kelly as a sympathetic victim. *See Goudeau*, 239 Ariz. at 466 ¶ 196. If anything, the statement made Kelly a less-sympathetic victim because it described him as a drug addict and recidivist criminal.

**¶133** Second, the prosecutor stated in his guilt-phase opening statement:

> Sean [Kelly] had to go into protective custody
> because while he was in prison once, he refused

to commit an act of violence on another inmate,
so he was forced to go into PC.

Now in the outside world, that would be
normal. But to the world that the defendant
lived in and the world of the [AB], that's
weakness. And weak inmates are targets for
men who want membership in the [AB].

This statement was later corroborated by expert witness testimony on gang
culture as well as Riley's letter. The prosecutor's good faith is evinced by
this corroboration. There is no misconduct here.

¶134 Third, the prosecutor stated in his guilt-phase opening
statement, "[A shank is] designed for one purpose and one purpose only
and that is to kill." This statement is corroborated by expert testimony that
shanks are weapons. Certainly, the lethal purpose of the shanks in this case
is evinced by the fact that Kelly was killed with them. No misconduct
occurred here.

¶135 Fourth, the prosecutor stated in his guilt-phase opening
statement, "The door to Sean's cell had been left open probably by Sean's
cellmate Kenneth Severns who was not inside the cell." Riley interprets this
statement as meaning that "[Sean Kelly's] cellmate left open the cell door in
order to facilitate the offense." Riley misinterprets the prosecutor's
statement. The prosecutor said that Severns probably left the cell door
open—he did not assert that Severns did so to facilitate the murder. That
Severns probably left the door open was later corroborated by Officer
Vincent's testimony that Severns was outside his cell during the time when
Kelly was murdered. The statement did not imply that Severns left the door
open to facilitate Kelly's murder. No misconduct occurred here.

¶136 Fifth, the prosecutor stated in his guilt-phase opening
statement:

Now Eric Olsen lived in the C Pod so he was
able to slither away quickly back to his cell
unnoticed. But the defendant and his cellmate
and accomplice, Dennis Levis, had farther to go.

They had to cross from Cell 6 back to Cell A—
or back from Cell 6 to A Pod to Cell 9.

Riley interprets this statement to mean that Olsen was an accomplice "and was able to get back to his cell without being seen." That Olsen lived in C Pod while Levis and Riley lived in A Pod was later corroborated by Officer Todd Springsteen and Officer Dziadura. Further, the State charged Riley with first degree murder. An element of first degree murder is premeditation. A.R.S. § 13-1105(A)(1). Olsen's alleged participation shows premeditation because it would tend to show that the murder was planned beforehand, so the prosecutor's comments did not "call[] to the jury's attention matters it should not have considered in reaching its decision." *See Goudeau*, 239 Ariz. at 466 ¶ 196 (quoting *Nelson*, 229 Ariz. at 189 ¶ 39). Rather, the comments appropriately drew the jury's attention to an element of the charged crime. No misconduct occurred here.

¶137　　　Sixth, the prosecutor stated in his guilt-phase closing argument, "Where did they stab? What did Dr. Hu tell you? . . . Where are they stabbing with these knives? The neck, the heart, the kidney. There is nowhere that you can put this in your neck and not be lethal." The last sentence was not supported by Dr. Hu's testimony because he did not testify that every neck stab wound is lethal; however, it is not clear that the prosecutor intended to attribute his comment on the lethality of neck wounds to Dr. Hu. More importantly, the statement was not misconduct because it did not "call[] to the jury's attention matters it should not have considered in reaching its decision." *See id.* Taken in context, this statement was meant to impress upon the jury that stabbing someone in the neck is generally lethal, evincing Riley's intent to murder Kelly. Intent is an element of first degree murder. *See* § 13-1105(A)(1). Further, there is no reasonable probability that the jury was "influenced by the remarks" to find intent where there was none. *See Goudeau*, 239 Ariz. at 466 ¶ 196. Kelly was stabbed 114 times. Even without the prosecutor's characterization of neck wounds as always being fatal, the jury could find intent to murder from the number and location of Kelly's stab wounds. Thus, this statement was well within the "wide latitude" given to parties in closing argument and was not misconduct. *See id.*

¶138　　　Seventh, the prosecutor stated in his guilt-phase closing argument, "But what Dr. Hu told you is that it's impossible, impossible for blood spatter to get behind your ear and onto—the small little particles onto

your body if the victim is dead." This is a reasonable inference from Dr. Hu's testimony that bleeding does not occur if the heart is not beating. *See id.* No misconduct occurred here.

**¶139** Finally, the prosecutor stated in his guilt-phase closing argument:

> So the question is who did it. We constantly heard about cell seven and cell one. Cell seven we can eliminate right off the bat. But the moment CO [correctional officer] Franco—the idea cell seven had anything to do with this crime was blown out the window. It was impossible. CO Franco told you that she stood at that cell, she spoke to the inmates—to those inmates and she shut the door.
>
> So that only leaves whoever was up on the second tier and CO Vincent told you that she had an eye on them. And it's just common sense. There was no way they could rush down, whoever these mystery little inmate ninjas are, completely undetected, stab, stab, stab, rush back up and do this without leaving a lick of blood.

Riley interprets this statement to mean that "[n]o one could come down from the second tier of the cell block without CO Vincent's knowledge." But the prosecutor's statements are "reasonable inferences from the evidence." *See id.* Specifically, Officer Vincent testified that she was watching the area, and Exhibit 14 shows that she had a full vantage point of both tiers of C Pod. No misconduct occurred here.

> *iv.     Consistency of Prosecutor's Remarks During Guilt-Phase Opening Statements and Aggravation-Phase Closing Arguments*

**¶140** Riley briefly argues that the prosecutor committed misconduct when he made inconsistent statements during guilt-phase opening statements and aggravation-phase closing arguments concerning

whether Riley targeted Kelly or whether Kelly's murder was at random. The guilt-phase opening statements are the following:

> Sean had to go into protective custody because while he was in prison once, he refused to commit an act of violence on another inmate, so he was forced to go into PC.
>
> Now in the outside world, that would be normal. But to the world that the defendant lived in and the world of the [AB], that's weakness. And weak inmates are targets for men who want membership in the [AB].

The aggravation-phase closing statements at issue are the following:

> He [Riley] says—I believe it's on page 2 or 3 [of his letter]—that he is hunting big time. He is hunting. He is not hunting for one person, specifically. He is coldly and dispassionately laying out any target that he can get. It doesn't matter who. Any golden goose.

¶141        These statements are not inconsistent. The prosecutor's statements reflect the State's theory that the AB targeted Kelly because of his previous actions and that Riley did not care who he killed so long as it gained him admission to the AB. Once Riley received AB approval, he killed Kelly not because *he* had previously targeted him, but because *the AB* sanctioned the murder and rewarded Riley for killing Kelly. No error occurred here.

¶142        Riley asserts there was another inconsistency in the guilt-phase opening statement and closing arguments. In the opening statement, the prosecutor told the jury Olsen was able to "slither away quickly back to his cell unnoticed." *See supra* ¶ 136. However, in the closing, the prosecutor stated that CO Vincent had a view of the second tier and none of the prisoners could have rushed down to commit the murder. *See supra* ¶ 139. Because Olsen lived on the second tier, Riley argues the comments were inconsistent.

**¶143** These statements may be inconsistent; however, Riley cites to no case law, and we have found none, which holds that inconsistent statements per se constitute misconduct. Rather, the standard for determining misconduct remains the two-prong *Goudeau* test. 239 Ariz. at 466 ¶ 196. Evidence of Olsen's participation, as discussed in the first statement, was proper because it tended to show premeditation, which is an element of first degree murder. *See* § 13-1105(A)(1). As for the second statement, suggestion of Olsen's non-participation did not bring anything to the attention of the jury, for or against Riley. If anything, such an inconsistency likely inured to Riley's benefit to the extent it undermined the State's theory. In any event, any inconsistency in the prosecutor's statements regarding Olsen's participation in Kelly's murder was unlikely to influence the jury as to Riley's guilt given the weight of the evidence. *See Goudeau*, 239 Ariz. at 466 ¶ 196.

**¶144** As a final note on the prosecutor's opening statement and closing argument, any prejudice was ameliorated by the trial court's curative instructions. When a trial court instructs the jury that the statements made by the attorneys are not evidence, the instructions "generally cure any possible prejudice from argumentative comments during opening statements." *State v. Manuel*, 229 Ariz. 1, 6 ¶¶ 23–24 (2011). Here, the trial court instructed the jury three times that the statements made by the attorneys were not evidence. Thus, any prejudice that Riley may have suffered due to the prosecutor's comments during opening statement or closing argument is ameliorated by the trial court's curative instructions.

     *v.*     *Prosecutor's Statements Regarding Lack of Witnesses for Riley*

**¶145** Riley argues that the prosecutor committed misconduct by asserting that no witnesses had come forward to testify due to AB intimidation. In his guilt-phase closing argument, Riley said, "Now, all of these guys are neighbors. Look at the photo in that exhibit. You're telling me that nobody heard any screaming. Nobody came forward and said that they saw something or heard something. This was an inside-of-C-Pod job, and their silence speaks volumes." On rebuttal, the prosecutor said, "Why wouldn't people testify against Tommy Riley? . . . Maybe because the [AB] did their job that day. What did Keland Boggs tell you? Fear and intimidation is how they run the prisons."

47

¶146 Here, Riley's closing argument invited the prosecutor's response. *See Young*, 470 U.S. at 12–13; *see also Alvarez*, 145 Ariz. at 373. Riley implied that no witnesses had come forward because the murder was an "inside job," thus evincing Riley's innocence. The prosecutor rebutted that the lack of witnesses was likely due to the AB's intimidation tactics. Further, this statement was a fair inference from the evidence. No misconduct occurred here.

> *vi.*    *Prosecutor's Statements About Kelly's Time in Protective Custody*

¶147 During the guilt-phase of the trial, the following colloquy occurred between the prosecutor and Officer Dziadura:

> Q. With respect to Sean Kelly, what did you learn about the reasons why he had went into protective custody?
>
> A. Well, he was at our Douglas facility. He was asked by influential white inmates to assault another inmate. He refused to do so. They came back to him and told him if he wasn't going to do it he needed to cover up some lightning bolts tattoo that he had on his person or be injured.

In his closing argument in the mitigation phase, the prosecutor said:

> They honestly got up there and asked you about how about it is [sic] the Department of Correction's fault, how they create a kill-or-kill-be killed environment. You want to talk about kill-or-be-killed environment; he [Riley] is the kill-or-get-killed environment.
>
> You don't have two more different people, Sean Kelly, who had to go to protective custody because he wouldn't be a part of that world, and the defendant, who executed him. It is not kill or get killed. It is like that because people like

> Tommy Riley control the prisons. Men like
> Sean Kelly put their head down and do their
> time and they won't attack another inmate.
> People like the defendant prey on that and they
> show no mercy.

**¶148** Riley specifically challenges the statements that Kelly went into protective custody to avoid the "kill-or-get-killed environment." Riley interprets the prosecutor's commentary as asserting that Kelly had renounced violence and argues that the prosecutor intended to portray Kelly in a more positive light. Riley asserts this was intentional misconduct, was fundamental error, and ultimately prejudiced him because Kelly's renunciation of violence was not in evidence, was irrelevant and, thus, called the attention of the jury to matters which it should not have considered.

**¶149** Riley's arguments are unpersuasive. First, the evidence of why Kelly went into protective custody is relevant. *See* Ariz. R. Evid. 401. The State's theory was that Kelly was targeted because he entered protective custody to avoid the AB's directive to assault another inmate. The comment, thus, tends to make Riley's guilt more probable because it shows motive which is relevant when determining guilt.

**¶150** Second, the prosecutor's commentary in his mitigation-phase closing argument was a reasonable inference from the trial evidence, namely Officer Dziadura's testimony that Kelly went into protective custody because he refused to assault another inmate and Boggs's testimony that refusing to earn a "political tattoo" could result in murder of the refusing party. *See Goudeau*, 239 Ariz. at 466 ¶ 196. Accordingly, no misconduct occurred here, much less fundamental error.

> vii. *Prosecutor's Statements That Allegedly Inflamed the Jury's Passions*

**¶151** During the guilt-phase opening statement, the prosecutor stated:

> Now Sean wasn't a child molester, he wasn't a
> rapist and he wasn't a snitch. Sean had to go
> into protective custody because while he was in

> prison once, he refused to commit an act of
> violence on another inmate, so he was forced to
> go into PC.
>
> . . .
>
> The man that the defendant chose to hunt and
> murder was a man by the name of Sean Kelly.
> Now, Sean Kelly was just a guy. He was in
> prison because he's a drug addict and he was
> caught in the revolving door of prison,
> addiction, prison, even though he had a loving
> family that cared for him.

During the penalty-phase closing argument, the prosecutor illustrated the differences between the victim, who went into protective custody to avoid prison violence, and the defendant, who embraced it. *See supra* ¶ 147. Riley argues that the prosecutor improperly intended "to promote a verdict based on sympathy for the victim."

¶152 Riley's argument is unpersuasive. Even if we accept the premise that these statements brought to the jury's attention matters it should not have considered—i.e., sympathy for the victim—there is little-to-no probability that the statements—which characterized Kelly as a drug addict and a recidivist offender—influenced the jury. *See Goudeau*, 239 Ariz. at 466 ¶ 196. The statements were fleeting and unconnected, and the jury was instructed four times to not take sympathy for the victim into account when making its decision. *See Escalante-Orozco*, 241 Ariz. at 282 ¶ 102 (finding that fleeting comments made by the State did not constitute fundamental, reversible error especially because the court instructed the jury to not take sympathy for the victim into consideration).

¶153 Riley also objects to the prosecutor's comments during the penalty-phase closing argument. There, the prosecutor said:

> But he did not die alone. He did not die alone,
> because the defendant, like a jackal standing
> over a fresh kill, turned over his dying body and
> picked him clean from his clothing so that he
> could get away with this murder. That is how
> Sean Kelly died.

But unflattering analogies during closing arguments that are supported by facts in common knowledge are permissible. *State v. Jones*, 197 Ariz. 290, 306 ¶ 41 (2000). In *Jones*, the prosecutor told the jury that just because the defendant was a "nice guy" and "polite" did not mean that he could not have committed the charged murders and mentioned that Ted Bundy and John Wayne Gacy were also polite. *Id.* We found these statements to be permissible because "jurors may be reminded of facts that are common knowledge" and because the statement "drew an analogy between Jones's attitude at trial and that of well-known murderers." *Id.*; *see also Goudeau*, 239 Ariz. at 465-66 ¶¶ 195–97 (referring to a defendant as a "wolf in sheep's clothing" during closing argument was not improper). Here, it is common knowledge that jackals are opportunistic, predatory animals. Comparing Riley's cold act of divesting a dying man of his clothing from his cell to a jackal's actions was within the range of permissible argument.

¶154 Finally, Riley contends the prosecutor's comment near the conclusion of the penalty-phase closing argument invited the jury to convict him based on anger rather than on the evidence presented. The prosecutor said:

> You are here to uphold the law, and that is the law that the judge gave you. We can show our outrage at this crime through your verdict. We can show outrage at this crime through the punishment of the defendant.

¶155 First, it is not clear that this statement appealed to the jury's passions at all. The prosecutor urged the jury to express its outrage at the crime for which Riley was already convicted by punishing him. Certainly, it is proper for the State to urge the jury to punish a defendant for his crimes. An invitation to show "outrage" at the crime does not invite the jury to punish the defendant on anything other than the evidence presented at trial.

¶156 Second, even if the statement were misconduct, it did not amount to fundamental error. In *Jones*, the State asked the jury to convict the defendant on behalf of the victim, their families, and the people of Arizona. 197 Ariz. at 307 ¶ 43. Even though we acknowledged that such a statement may have improperly evoked emotion in the jury, we found that any error did not amount to reversible error because it was a single

51

statement, the evidence against the defendant was substantial, and any error was cured by the trial judge instructing the jury to ignore statements "invoking sympathy." *Id.* at 306–07 ¶¶ 42–43. Here, the prosecutor made a much less provocative statement, and the trial judge instructed the jury to not be influenced by sympathy or passion on four separate occasions. Thus, any error was cured by the trial court's instructions.

> *viii.* *Prosecutor's Elicitation of Testimony in Violation of Rules of Evidence*

**¶157** Riley asserts that the prosecutor improperly elicited testimony regarding Kelly's time in protective custody and other evidence in violation of Arizona's Rules of Evidence. As discussed, *supra* ¶¶ 57–78, any error that may have arisen from the admission of that evidence was not fundamental. For this reason, Riley's argument on this point fails.

> *ix.* *Cumulative Effect*

**¶158** We may reverse a conviction due to prosecutorial misconduct if "the cumulative effect of the alleged acts of misconduct shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Escalante-Orozco*, 241 Ariz. at 280 ¶ 91 (quoting *Bocharski*, 218 Ariz. at 492 ¶ 74). Riley argues that the cumulative effect of the alleged misconduct proves the prosecutor's intent to prejudice him and his conviction should be reversed. For the reasons discussed, we reject Riley's claim; there was no error in the prosecutor's contested statements. Even if there were error, Riley has failed to prove that the prosecutor did so with "indifference" or "specific intent." For these reasons, Riley is not entitled to relief on these grounds.

## J.     Failure to Instruct Jurors of Ineligibility for Parole

**¶159** Riley argues that the trial court committed error by failing to issue a *Simmons* instruction regarding his ineligibility for parole. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). Because Riley failed to object on *Simmons* grounds during his trial, "our review [is limited] to fundamental error." *State v. Bush*, 244 Ariz. 575, 591 ¶¶ 66–68 (2018) (citing *State v. Valverde*, 220 Ariz. 582, 584–85 ¶¶ 9–12 (2009), *abrogated on other grounds by Escalante*, 245 Ariz. 135); *see also Hargrave*, 225 Ariz. at 14 ¶¶ 50–51.

¶160    Riley argues that he sufficiently objected by submitting his own Proposed Preliminary Instructions (guilt phase) that did not "include the objectionable reference to release," which the trial court rejected. This argument is unpersuasive for two reasons. First, neither Riley's nor the trial court's preliminary instructions read to the jury contained the "objectionable reference to release" because the guilt phase instructions did not pertain to the prospective penalty following conviction; thus, Riley's proposed guilt phase jury instructions cannot reasonably be construed as an objection to the reference to release. Second, as discussed below, at no point did Riley object to any reference to the possibility of release nor did he affirmatively request an alternative instruction regarding his ineligibility for parole.[4]

¶161    During jury selection, the trial court provided prospective jurors with written questionnaires. Both Riley and the prosecutor reviewed and approved the questionnaire at a pre-trial status conference. In describing the penalty phase of the trial, the questionnaire stated, in relevant part:

> If you unanimously find the mitigation is sufficiently substantial to call for leniency, the Court will sentence the defendant to either life imprisonment without the possibility of release or *life without release until at least twenty-five years have passed*.

Question 62 substantially reiterated that statement and asked the jurors if they "agree[d] with the law that requires the judge, not the jury, to make the decision about which type of life sentence to impose."

¶162    On September 29, 2015, on the second day of voir dire, the trial court discussed with the parties whether they wanted the trial court to read an overview of the death penalty process to each juror panel before questioning them. Riley stated that he was "comfortable" with the contents

---

[4] Riley raises several other arguments for de novo or fundamental error review, most of which are based on the proposition that a court must sua sponte issue a *Simmons* instruction. Riley's arguments are unavailing because he fails to distinguish *Bush*, which expressly forecloses his claim in light of his failure to object to his possibility of release. 244 Ariz. at 593 ¶ 75.

of the overview and, along with his counsel, agreed that the trial court should read the overview to each panel. Two days later, during a conference to settle miscellaneous matters, the trial court reiterated its intent to read the overview to the jurors, and neither side objected nor raised any concerns.

¶163 On October 5, before the first juror panel entered the courtroom, the trial judge again reiterated his intent to read the overview to the jurors, and neither side objected. As part of the overview, the trial court informed the first juror panel that:

> If your sentence is death, he will be sentenced to death. If your verdict is that the defendant should be sentenced to life, he will not be sentenced to death, and the Court will sentence him to either *life without the possibility of release until 35 calendar years are served*, or natural life, which means the defendant would never be released from prison.

Later the same day and over the next few days of voir dire, the trial court continued to instruct each juror panel with the same language from the overview.

¶164 On November 4, following Riley's conviction and during a telephonic status conference before the aggravation phase, the trial court stated, "[M]y JA [Judicial Assistant] sent out the instructions and she didn't hear back from either lawyer as far as the eligibility phase instructions that she sent out." In response, both the State and Riley's counsel stated that they had received the instructions and had no corrections.

¶165 On November 5, at the start of the aggravation phase, the trial court informed counsel for both sides that it would begin by reading the instructions. Both parties acknowledged that they had reviewed the instructions, and neither party objected to their contents. The approved instructions the trial court read to the jury expressly stated that Riley could be sentenced to life imprisonment "with the possibility of release after 25 years."

¶166        On November 12, at the end of the penalty phase, the trial court read and explained the verdict form before releasing the jury to deliberate.  As part of its explanation, the trial court stated that if the jury found that Riley should be sentenced to life, then Riley could be "sentenced to life in prison with the possibility of release in 25 years."  Riley's counsel reviewed and approved the verdict form.

¶167        Riley argues the trial court violated his right to due process by failing to provide the jury with a *Simmons* instruction—one that informed the jury that Riley was ineligible for parole if given a life sentence.  Riley's argument, however, is premised on authority that predates our decision in *Bush*, which forecloses his claim.  *See* 244 Ariz. at 593 ¶ 74.

¶168        In *Bush*, we adopted a "narrow interpretation of *Simmons*," reasoning that "the due process right under *Simmons* merely affords a parole-ineligible capital defendant the right to 'rebut the State's case' (if future dangerousness is at issue) by informing the jury that 'he will never be released from prison' if sentenced to life."  244 Ariz. at 592–93 ¶¶ 73–74 (quoting *Simmons*, 512 U.S. at 177 (O'Connor, J., concurring in judgment)).  We noted that relief under *Simmons* "is foreclosed by [the defendant's] failure to request a parole ineligibility instruction at trial."  *Id.* at 593 ¶ 74 (quoting *Campbell v. Polk*, 447 F.3d 270, 289 (4th Cir. 2006)).  Ultimately, we held that despite the trial court's repeated instructions to the jury that Bush would be eligible for parole, and defense counsel's brief and "vaguely voiced disagreement before jury selection over whether jurors should 'be advised as to the possibility of release,'" no fundamental *Simmons* error occurred because Bush failed to show "that he was deprived of the right to inform the jury of his parole ineligibility."  *Id.* at 590 ¶ 64, 592 ¶ 70, 593 ¶ 75 ("Unlike in the aforementioned cases [in which courts found reversible *Simmons* error], the trial court neither refused to instruct, nor prevented Bush from informing, the jury regarding his parole ineligibility.").

¶169        Here, the trial court afforded Riley numerous opportunities to object to, or modify, the jury questionnaire, the death penalty overview, the eligibility phase jury instructions, and the verdict form, but Riley and his counsel declined.  More importantly, at no point did Riley or his counsel offer parole ineligibility instructions orally or in writing.  As in *Bush*, Riley "has not shown that he was deprived of the right to inform the jury of his parole ineligibility."  244 Ariz. at 593 ¶ 75.  Despite the trial court's numerous references to Riley's release eligibility, "the trial court neither

refused to instruct, nor prevented [him] from informing, the jury regarding his parole ineligibility." *See id.* In fact, Riley's counsel repeatedly informed the jury that Riley would never be released from prison if given a life sentence and the prosecutor never disputed the point. Thus, Riley failed to establish a *Simmons* error and is not entitled to relief on this issue.

¶170 Consequently, because Riley failed to establish error even if he would have been entitled to a requested *Simmons* instruction because future dangerousness was at issue, we need not address that issue. Similarly, we need not address whether Riley "carried his burden of establishing prejudice resulting from any alleged *Simmons* error." *Id.*

## K. Request to Revisit Decisions Made in *Hidalgo*

¶171 Riley argues Arizona's capital punishment scheme is unconstitutional because it fails to legislatively narrow the class of first degree murders eligible for the death penalty and the trial court abused its discretion by refusing to grant an evidentiary hearing on this issue. We recently rejected substantially similar claims in *Hidalgo*. 241 Ariz. at 549–52 ¶¶ 14–29.

¶172 We review constitutional questions de novo, *State v. Smith*, 215 Ariz. 221, 228 ¶ 20 (2007), and a trial court's failure to grant an evidentiary hearing for an abuse of discretion, *State v. Gomez*, 231 Ariz. 219, 226 ¶ 29 (2012).

¶173 In *Hidalgo*, we rejected the argument that Arizona's death penalty scheme does not sufficiently narrow the class of defendants eligible for the death penalty. 241 Ariz. at 549–52 ¶¶ 14–29. That argument was premised, in part, on the same statistical evidence put forth by Riley. *Id.* at 551 ¶ 25. We also rejected the argument that the trial court's refusal to grant an evidentiary hearing when the previous issue was raised below was an abuse of discretion. *Id.* at 548–49 ¶¶ 8–13.

### i. Constitutionality of Arizona's Death Penalty Statutes

¶174 We have repeatedly rejected the argument "that our legislature has not narrowed the class of persons eligible for the death penalty." *State v. Greenway*, 170 Ariz. 155, 164 (1991); *see Hidalgo*, 241 Ariz. at 551 ¶ 27. But Riley asks us to reconsider that argument based primarily

on statements by Justice Breyer in the denial for certiorari for *Hidalgo*. *Hidalgo v. Arizona*, 138 S. Ct. 1054, 1057 (2018) (mem.) (Breyer, J., statement). We are not persuaded.

**¶175** "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). State legislatures can provide this narrowing function by either narrowly defining capital offenses "so that the jury finding of guilt responds to this concern," or by "broadly defin[ing] capital offenses and provid[ing] for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id.* at 246.

**¶176** Riley first asks us to "review the holistic aggravation scheme." Although this argument is somewhat unclear, Riley appears to be urging us to examine the aggravating factors in their entirety—as opposed to individually—when considering whether the legislature has sufficiently narrowed the class of persons eligible for the death penalty. If that is the case, we rejected a similar argument in *Hidalgo*, noting that Supreme Court precedents undermine such a position. 241 Ariz. at 550–51 ¶¶ 19–20, 26 ("Observing that at least one of several aggravating circumstances could apply to nearly every murder is not the same as saying that a particular aggravating circumstance is present in every murder.").

**¶177** Riley next argues that Arizona's broad definition of first degree murder does not satisfy the legislative duty to narrow the class of persons eligible for the death penalty. On this point, Riley is likely correct. In *Hidalgo*, we referenced Arizona's limitation of the death penalty to first degree murder as one of several factors to support our holding. 241 Ariz. at 552 ¶ 28 (citing *Greenway*, 170 Ariz. at 164). But Arizona's definition of first degree murder is overly broad, encompassing all intentional, premeditated murders. *See* § 13-1105(A); *cf. Lowenfield*, 424 U.S. at 245 (discussing, with approval, the constitutionality of the death penalty statutes of Texas and Louisiana which "narrowly defined the categories of murders for which a death sentence could be imposed"). Nevertheless, we expressly rejected that argument in *Greenway*, and the lack of a narrow definition of first degree murder is not dispositive. *See Greenway*, 170 Ariz. at 164; *see also Lowenfield*, 484 U.S. at 246.

¶178        Next, relying on the statistical analysis presented to the trial court, Riley contends those results directly contradict our holding in *Hidalgo* that Arizona's death penalty scheme sufficiently narrows the class of persons eligible for the death penalty.  In addressing this argument in *Hidalgo*, we stated:

> The Court has not looked beyond the particular case to consider whether, in aggregate, the statutory scheme limits death-sentence eligibility to a small percentage of first degree murders.  Even if Hidalgo is right in his factual assertion that nearly every charged first degree murder could support at least one aggravating circumstance, no defendant will be subject to a death sentence merely by virtue of being found guilty of first degree murder and, as Hidalgo acknowledges, death sentences are in fact not sought in most first degree murder cases. Observing that at least one of several aggravating circumstances could apply to nearly every murder is not the same as saying that a particular aggravating circumstance is present in every murder.

241 Ariz. at 551 ¶ 26.  Justice Breyer interpreted these statements to mean we "assum[ed] that the aggravating circumstances fail to materially narrow the class of death-eligible first-degree murder defendants." *Hidalgo v. Arizona*, 138 S. Ct. at 1056.  This suggests that our rejection of the "holistic view" of aggravating circumstances in favor of the narrowing nature of individual aggravating circumstances is contrary to at least four of the Justices' interpretation of Supreme Court precedent.  But because we decline to overrule our holding in *Hidalgo* in favor of a minority opinion from the Supreme Court, this argument carries little weight. *See Teague v. Lane*, 489 U.S. 288, 296 (1989) (noting that opinions accompanying certiorari denials have no precedential value).

¶179        Finally, Riley argues we erroneously relied on jury functions (i.e., finding the existence of an alleged aggravating circumstance beyond a reasonable doubt) and individualized sentencing to support our holding in

*Hidalgo* because the former "do[es] not show the necessary *legislative* narrowing that [U.S. Supreme Court] precedents require" and the latter "concerns an entirely different capital punishment requirement." Both arguments are supported by Supreme Court precedents, which require the legislature to provide the narrowing function within the statutory definitions of the capital offenses or the aggravating circumstances. *See Tuilaepa*, 512 U.S. at 979; *Lowenfield*, 484 U.S. at 246; *Zant*, 462 U.S. at 878. But, as stated previously, we held in *Hidalgo* that the aggravating circumstances set forth by the Arizona Legislature provide the constitutionally required narrowing function, and that holding remains binding precedent. Thus, the fact that some of the arguments put forth to support that holding may be contradicted by some Supreme Court precedents does not invalidate that holding.

¶180　　In sum, the arguments and accompanying conclusions of law enunciated by Justice Breyer and embraced by Riley are not mandated by any current, binding precedents. Accordingly, because Riley has not established that *Hidalgo*'s holding is incorrect, he is not entitled to relief on this issue.

### ii.　Denial of Evidentiary Hearing

¶181　　Riley provides three reasons to support his argument that the trial court abused its discretion by failing to grant an evidentiary hearing on the facts supporting his claim that Arizona's death penalty scheme was unconstitutional. None of them is persuasive.

¶182　　First, Riley argues the trial court's refusal to conduct an evidentiary hearing infringed his right to a meaningful appeal because the lack of a hearing resulted in a record that was insufficiently complete to allow an adequate appeal of the issue. Riley relies on Justice Breyer's statement respecting denial of certiorari in *Hidalgo* to show the impact the lack of hearing had on his appeal. *See Hidalgo*, 138 S. Ct. at 1056 (Breyer, J., statement) (noting that the trial court's refusal to grant a hearing denied the defendant the opportunity to develop the record). Riley contends that Justice Breyer's statement contradicts our conclusion that Hidalgo was afforded an opportunity to be heard.

¶183　　A record that is of "sufficient completeness for adequate consideration of the errors assigned" is "satisfactory to afford [a] defendant

a meaningful right of appeal." *State v. Schackart*, 175 Ariz. 494, 499 (1993) (quoting in part *State v. Moore*, 108 Ariz. 532, 534 (1972)). Because the trial court assumed as true the evidence Riley and the other defendants presented for the constitutional issue, and we addressed the same issue on appeal in *Hidalgo*, there was no error for which the record was lacking.

¶184　　　Second, Riley argues that the refusal to conduct a hearing violated his right to due process because the right fundamentally requires an opportunity to be heard at a meaningful time and in a meaningful manner. He further contends that capital cases are entitled to a heightened due process protection because they are unique in their finality. Riley also cites the Arizona Constitution, stating that article 2, section 24 "provides broader protections for criminal appeals" than the Federal Constitution, which therefore "carries with it a greater demand for process."

¶185　　　To support this argument, Riley relies on the same cases relied upon by Hidalgo. In *Hidalgo*, we agreed that "due process entitles parties to notice and a meaningful opportunity to be heard" and "capital defendants are accorded heightened procedural safeguards," but we found the cases upon which Hidalgo relied were inapposite. 241 Ariz. at 548 ¶¶ 9–10. We also "recognized that evidentiary hearings are not required when courts need not resolve factual disputes to decide constitutional issues." *Id.* at 548 ¶ 8. And we rejected the argument "that a capital defendant is entitled to an evidentiary hearing on a pretrial motion even if the court's ruling does not turn on disputed facts." *Id.* ¶ 9. Although Hidalgo may not have relied on the Arizona Constitution to support his arguments, we clearly stated that "[p]rocedural due process does not require an evidentiary hearing on a motion when the legal claims do not turn on disputed facts." *Id.* at 549 ¶ 11. Riley has provided no case law to support his proposition that the Arizona Constitution would contradict this holding. Therefore, the trial court's refusal to conduct an evidentiary hearing did not violate his right to due process.

¶186　　　Finally, Riley argues under *Strickland v. Washington*, 466 U.S. 668 (1984), that the refusal to conduct a hearing violated his right to effective counsel because it impeded his counsel's ability "to make independent decisions about how to conduct the defense." This argument is likewise unpersuasive. The examples of government interference with a counsel's independent decisions discussed in *Strickland* reflect a direct interference with the rights of a defendant. *See, e.g., Geders v. United States*, 425 U.S. 80,

88–89 (1976) (bar on attorney-client consultation during overnight recess denied defendant his right to confer with counsel); *Herring v. New York*, 422 U.S. 853, 864–65 (1975) (bar on summation at bench trial denied defendant his right to be heard). Here, as discussed previously, Riley did not have a right to an evidentiary hearing. Therefore, the trial court's refusal to conduct one did not violate his right to effective counsel.

¶187 Because the trial court did not abuse its discretion by refusing to grant an evidentiary hearing on the facts supporting Riley's claim that Arizona's death penalty scheme was unconstitutional, Riley is not entitled to relief on this issue.

**L.** **Constitutionality of A.R.S. § 13-752(G) and Defendant's Right to Waive Presentation of Mitigating Evidence**

¶188 Riley argues that A.R.S. § 13-752(G) is unconstitutional because it fails to provide a process to allow jurors to consider mitigating evidence when a defendant waives his right to present such evidence. He also argues that the trial court erred by allowing him to waive his right to present mitigating evidence during the penalty phase of the trial.

¶189 We "review constitutional issues de novo, and, when possible, construe statutes to uphold their constitutionality." *Hausner*, 230 Ariz. at 82 ¶ 99. Because Riley failed to raise his second claim below, we review that challenge for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19.

¶190 In the aggravation phase, Riley's counsel told the trial court that Riley wanted to waive mitigation, against his counsel's advice. Riley's counsel declared that he had intended to call several witnesses to testify about various mitigating circumstances. The trial court then engaged Riley in a colloquy, and Riley avowed that he understood his right to present mitigation, he was aware of the evidence his attorneys intended to present, he had discussed his waiver with his attorneys, he understood that the State could still argue for the death penalty even if Riley waived his right to present mitigating evidence, and he understood that the jurors would still make the decision on whether death was the appropriate sentence. Riley confirmed his decision to waive mitigation and avowed he was doing so voluntarily.

¶191     The trial court found that Riley's waiver was made knowingly, intelligently, and voluntarily, but it approved Riley's counsel's motion to have Riley prescreened for competency. After receiving the results confirming Riley's competency, the court denied Riley's counsel's request for another competency evaluation, but it reengaged Riley in another mitigation waiver colloquy, which substantially mirrored its previous discussion with him. The court again found that Riley waived his right to present mitigation knowingly, intelligently, and voluntarily.

¶192     During the penalty phase, the court instructed the jury as follows:

> During this part of the sentencing hearing, the defendant and the State may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for a sentence less than death.
> . . .
>
> Mitigating circumstances may be found from any evidence presented during the trial, during the first part of the sentencing hearing, or during the second part of the sentencing hearing.
>
> You should consider all of the evidence without regard to which party presented it. Each party is entitled to consideration of the evidence whether produced by that party or by another party.
> . . .
>
> Mitigating circumstances may be offered by the defendant or State or be apparent from the evidence presented in any phase of these proceedings. You are not required to find that there is a connection between a mitigating circumstance and the crime committed in order to consider the mitigation evidence. Any connection or lack of connection may impact the

quality and strength of the mitigation evidence.
. . .

The fact that the defendant has been convicted of first degree murder is unrelated to the existence of mitigating circumstances. You must give independent consideration to all of the evidence concerning mitigating circumstances despite the conviction. You may also consider anything related to the defendant's character, propensity, history or record, or circumstances of the offense.
. . .

You are not limited to mitigating circumstances offered by the defendant. You must also consider any other information that you find is relevant in determining whether to impose a life sentence, so long as it relates to an aspect of the defendant's background, character, propensities, record, or circumstances of the offense.

¶193 Riley argues that § 13-752(G) is unconstitutional because the Eighth Amendment requires the sentencer in a capital case to consider all available mitigating evidence, regardless of the defendant's desire to have that information presented, and the statute does not provide a process to allow jurors to consider mitigating evidence when a defendant waives his right to present such evidence. He asserts that a jury cannot perform the requisite individualized determination in a consistent manner if consideration of mitigating circumstances is subject to "the whim of the defendant."

¶194 The cases upon which Riley relies do indeed hold that the Eighth Amendment requires individualized consideration of mitigating factors by the sentencer, but none of them suggests that when a defendant waives his right to present mitigation, the court must provide some other means by which the sentencer can consider that potentially available but unoffered mitigating evidence. *See Tuilaepa*, 512 U.S. at 972–73 (noting the requirement for individualized consideration is satisfied "when the jury *can*

consider relevant mitigating evidence" (emphasis added)); *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (holding unconstitutional a statute that limited the "range of mitigating circumstances which *may* be considered by the sentencer" (emphasis added)).

**¶195** In fact, the Supreme Court expressly rejected the argument that a jury's failure to consider mitigating circumstances due to the defendant's waiver of his right to present evidence of those circumstances violates the Eighth Amendment. *See Blystone v. Pennsylvania*, 494 U.S. 299, 306–08, 206 n.4 (1990). The Eighth Amendment requires only that juries in capital cases be *allowed* to consider all relevant mitigating evidence, and that requirement is satisfied when the jury "[is] specifically instructed to consider, as mitigating evidence, any matter concerning the character or record of the defendant, or the circumstances of his offense." *Id.* at 307–08 (internal quotations marks omitted). Similarly, relying on *Blystone*, we have repeatedly held that a defendant's knowing, intelligent, and voluntary waiver of his right to present mitigation does not violate the Eighth Amendment even when it precludes a jury from considering all relevant mitigation in determining whether to impose the death penalty. *See Gunches*, 240 Ariz. at 203–04 ¶¶ 15–20; *Goudeau*, 239 Ariz. at 473–74 ¶¶ 244–45; *Hausner*, 230 Ariz. at 85 ¶ 118; *State v. Murdaugh*, 209 Ariz. 19, 33–34 ¶¶ 70–71 (2004).

**¶196** Riley attempts to incorporate our analysis in *State v. Prince*, 226 Ariz. 516 (2011), to support his arguments, asserting that juries have a *duty* to consider, and therefore *must* consider, all mitigating evidence. But that case is inapposite. Although we did discuss the jury's "duty" to consider mitigating evidence, it did not suggest in any way that a defendant's waiver of his right to present mitigating evidence impedes that duty. *See id.* at 526–27 ¶¶ 15–20. In discussing the jury's duty, we cited to *State ex rel. Thomas v. Granville*. *Id.* ¶ 16. *Granville* emphasized that any mitigating circumstances to be considered by the jury must be "proved by the defendant or present in the record." 211 Ariz. 468, 472–73 ¶¶ 17–18 (2005); *see also State v. Roscoe*, 184 Ariz. 484, 499 (1996) ("That the burden is on the defendant reinforces the conclusion that his personal decision not to present certain mitigating evidence is within his discretion."). Indeed, this Court impliedly held § 13-752(G) to be constitutionally sound when we ultimately concluded that the "liberal admission of . . . evidence" under § 13-752(G) "preserves the entire statutory scheme's constitutionality." *Prince*, 226 Ariz. at 526 ¶ 16, 527 ¶ 20.

¶197    Riley argues that we should reconsider our numerous holdings on this issue and adopt a procedure from Florida that requires prosecutors to compile comprehensive reports of potentially mitigating evidence when a defendant refuses to present his own mitigation. *See Marquardt v. State*, 156 So. 3d 464, 491 (Fla. 2015). But we rejected a similar argument in *Hausner*, refusing to follow the decisions of a minority of courts that held that mitigation must be presented even over a defendant's objection to satisfy the state's interest in a fair and reliable sentencing determination. 230 Ariz. at 85 ¶ 120 (citing *State v. Koedatich*, 548 A.2d 939, 992–97 (N.J. 1988), which Florida courts relied on to adopt their mitigation procedures).

¶198    In sum, both the Supreme Court and this Court have repeatedly held that the Eighth Amendment requires only that a jury be *allowed* to consider mitigating evidence; it does not require a jury to be presented with that evidence over a defendant's objections. More importantly, we have already implicitly found § 13-752(G) constitutional. Accordingly, the failure of the statute to provide a process for presenting mitigating evidence over a defendant's objections does not render that statute unconstitutional, and Riley is not entitled to relief on this issue.

¶199    Riley's argument that the trial court erred by allowing him to preclude the presentation of mitigating evidence relies on his proposed solution to resolving the potential conflict between a defendant's right to self-representation under the Sixth Amendment and a trial court's authority to "requir[e] the defense to present mitigating evidence over the defendant's opposition." *See Hausner*, 230 Ariz. at 85 ¶ 119. Riley argues that Sixth Amendment rights are not absolute and must give way to the Eighth Amendment requirement for individualized consideration. In the alternative, Riley argues that the trial court should have denied Riley's request to preclude mitigating evidence because he effectively revoked his waiver of self-representation.

¶200    But even accepting Riley's arguments as true, thereby resolving the Sixth Amendment conflict identified in *Hausner*, Riley has failed to provide any persuasive arguments that support his underlying premise—that juries are constitutionally required to consider all mitigating evidence, even if that means presenting such evidence over the defendant's objections. No such constitutional requirement exists, and we expressly

rejected adopting any procedure that would impose such a requirement. *See id.* ¶ 120. In sum, we have repeatedly held that a competent defendant may knowingly, intelligently, and voluntarily waive mitigation. *See, e.g.,* *Gunches*, 240 Ariz. at 203 ¶ 17; *Goudeau*, 239 Ariz. at 473 ¶ 240; *Hausner*, 230 Ariz. at 84 ¶ 116. Absent any constitutional prohibition on defendants waiving their right to present mitigation, Riley is entitled to relief on this issue only if he did not knowingly, intelligently, and voluntarily waive mitigation.

**¶201** Here, Riley unquestionably waived his right to present mitigation. After multiple colloquies with Riley, the trial court determined he waived his right knowingly, intelligently, and voluntarily. The court's determination was further supported by the results of a competency evaluation requested by Riley's counsel. Before the jury's deliberations in the penalty phase, the trial court also properly instructed the jury, at length and in various ways, to consider all mitigating evidence from the parties and from the record, regardless of the source.

**¶202** The trial court did not err by finding that Riley waived his right to present mitigating evidence, and Riley has not persuaded us to reconsider our numerous precedents supporting a competent defendant's choice to waive mitigation. Accordingly, Riley is not entitled to relief on this issue.

## M. Abuse of Discretion in Jury's Imposition of Death Penalty

**¶203** Riley argues that the jury abused its discretion in finding he should be sentenced to death because there was no reasonable evidence in the record to sustain that decision. Because Riley committed the murder after August 1, 2002, we must review the jury's findings of aggravating circumstances and the imposition of death sentences for abuse of discretion, A.R.S. § 13-756(A), viewing the facts in the light most favorable to sustaining the verdicts. *State v. Naranjo*, 234 Ariz. 233, 249 ¶ 81 (2014). "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77 (2007)).

### i.     Aggravating Circumstances

**¶204**          As to Kelly's murder, the prosecution alleged, and the jury found beyond a reasonable doubt, five aggravating circumstances: (1) Riley was previously convicted of a serious offense, § 13-751(F)(2); (2) Riley committed the murder in an especially heinous, cruel, or depraved manner, § 13-751(F)(6); (3) Riley committed the murder while in the custody of the ADOC, § 13-751(F)(7)(a); (4) Riley committed the murder to promote, further or assist a criminal street gang, § 13-751(F)(11); and (5) Riley committed the murder in a cold and calculated manner without pretense of moral or legal justification, § 13-751(F)(13).

**¶205**          For the (F)(2) aggravator, the prosecution provided undisputed evidence that Riley was previously convicted of multiple counts of aggravated assault, kidnapping, and armed robbery.  For the (F)(6) aggravator, the prosecution provided sufficient evidence for the jury to determine that Riley murdered Kelly in an especially cruel manner.  On the cruelty prong, the prosecution provided evidence of Kelly's defensive wounds and his attempt to flee his attackers by wedging himself under the toilet in his cell.  The prosecution also produced evidence of Riley's own written account of the murder, in which he recounted Kelly's final words as he died.  On the heinous or depraved prong, the prosecution provided evidence that Riley relished the attack immediately afterwards and engaged in gratuitous violence.  The prosecution also relied again on Riley's letter, focusing on Riley's graphic and celebratory account of the murder.

**¶206**          For the (F)(7)(a) aggravator, the prosecution provided undisputed evidence that Riley was in the custody of the ADOC when he committed the murder.  For the (F)(11) aggravator, the prosecution provided evidence of Riley's affiliation with the AB with pictures of his gang tattoos, his own written account of why he committed the murder, and testimony from Boggs—the special investigator—who identified the AB as a criminal street gang and testified that Riley met certain criteria as a member.  Finally, for the (F)(13) aggravator, the prosecution relied once more on Riley's written account of the murder, focusing on Riley's lengthy planning and "hunting" for a target.

**¶207**          In sum, because the record provides substantial, reasonable evidence to support these uncontested findings, the jury did not abuse its discretion in finding the five aggravating circumstances.

*ii.     Imposition of Death Sentence*

**¶208**        Based on the record, the jury did not abuse its discretion when it sentenced Riley to death for murdering Kelly.  Because each juror makes an individual finding of whether any mitigating circumstances were sufficient to warrant leniency, we must uphold a death sentence "if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Naranjo*, 234 Ariz. at 250 ¶ 89 (citation omitted) (internal quotation marks omitted); *see also Morris*, 215 Ariz. at 341 ¶ 81.  Riley waived his right to present mitigation during the penalty phase, but "evidence admitted at the guilt phase is admitted for purposes of the sentencing phase, A.R.S. § 13–752(I), and the jury must 'consider the mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence.'"  *Hausner*, 230 Ariz. at 87 ¶ 129 (quoting *Granville*, 211 Ariz. at 473 ¶ 18).

**¶209**        Most of the mitigating evidence upon which Riley relies from the guilt phase of the trial is actually a *lack* of evidence.  Riley contends that the lack of evidence of his direct participation in Kelly's murder and general prison gang activity "reduced his moral culpability in the offense" sufficient to constitute an abuse of discretion on the jury's imposition of a death sentence.  The core of Riley's argument appears to suggest there may have been residual doubt about his participation in Kelly's murder.  But any such "claim[] of . . . residual doubt do[es] not constitute mitigation for sentencing purposes." *State v. Moore*, 222 Ariz. 1, 22 ¶ 133 (2009).

**¶210**        Riley also argues that the evidence that prison gangs could intimidate other prisoners into committing violent crimes on their behalf "did not support a conclusion that [he] had a 'choice' to refrain from participating in gang activity."  But Riley's own written account of the murder conclusively counters this argument.  In his letter, Riley explained in detail how he sought to identify and obtain approval to kill a victim to earn full membership with the AB.

**¶211**        Most importantly, Riley does not challenge the sufficiency of the evidence supporting the jury's finding of any aggravating circumstances, except for a vague reference to the accomplice liability issue. *See State v. Cruz*, 218 Ariz. 149, 170 ¶ 136 (2008) (holding that a jury did not

abuse its discretion by finding a particular aggravator because the defendant did not contest the evidence supporting the existence of that aggravator). Accordingly, because we conclude that a reasonable juror could find that Riley failed to establish sufficient and credible mitigation evidence, the jury did not abuse its discretion in returning a death sentence.

### N. Issues Raised to Avoid Preclusion

¶212 Riley identifies thirty-four issues he seeks to preserve for federal review. As he concedes, we have previously rejected each of his claims. We decline to revisit them.

### CONCLUSION

¶213 We affirm Riley's convictions and sentences.